## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
## GREEN BAY DIVISION

CITY OF ARCADIA, Individually and on behalf of all others similarly situated,

      Plaintiff,

      v.

AMERICAN INDUSTRIAL PARTNERS, LLC; AMERICAN INDUSTRIAL PARTNERS CAPITAL FUND IV, LP; AMERICAN INDUSTRIAL PARTNERS CAPITAL FUND IV (PARALLEL), LP; AIP/CHC HOLDINGS, LLC; OSHKOSH CORPORATION; REV GROUP, INC.; ROSENBAUER AMERICA LLC; and FIRE APPARATUS MANUFACTURERS' ASSOCIATION,

      Defendants.

Civil Action No.:

CLASS ACTION COMPLAINT

<u>JURY TRIAL DEMANDED</u>

# TABLE OF CONTENTS

Page

I.    NATURE OF THE CASE ........................................................................................1

II.   PARTIES ............................................................................................................3

    A.     Plaintiff City of Arcadia...................................................................3

    B.     Defendants .......................................................................................6

        1.     American Industrial Partners (AIP) ...........................................6
        2.     REV Group, Inc. .......................................................................8
        3.     Oshkosh Corporation ................................................................9
        4.     Rosenbauer America LLC ........................................................10
        5.     Fire Apparatus Manufacturers' Association ..............................11
        6.     Unnamed Defendants and Co-Conspirators...............................12
        7.     Agents and Affiliates ................................................................12

III.   JURISDICTION AND VENUE .........................................................................13

IV.   FACTUAL ALLEGATIONS ...........................................................................14

    A.     Fire Trucks ......................................................................................144

    B.     United States ...................................................................................16

    C.     Pre-2008 Overview of the Fire Truck Market ...................................16

    D.     Consolidation of the Fire Truck Market: AIP and REV Group............................17

    E.     Consolidation of the Fire Truck Market: Oshkosh ............................21

    F.     Consolidation of the Fire Truck Market: Rosenbauer ...........................23

    G.     Manufacturer Defendant's Collusion Minimizes Competition.............................23

    H.     Defendants use FAMA to exchange confidential, competitively
        sensitive information................................................................................25

        1.     FAMA Statistical Reports........................................................25
        2.     FAMA Meetings .......................................................................27

    I.     The Conspiracy Resulted in Defendants Suppressing Supply and Raising
        Prices of Fire Trucks During the Class Period......................................................28

        1.     Fire Trucks Backlogs Soared by 40% or More During the Class
            Period ........................................................................................28
        2.     In the Face of Increasing Demand, Defendants Failed to Increase
            Capacity and Have Shuttered Facilities, Worsening the Shortage ...........30

i

　　　3.　　The Price of Fire Trucks Doubled During the Class Period ..................33
　　　4.　　Defendants used "Floating Prices" to Charge Even More ........................33
　　　5.　　Defendants' Conspiracy had the Intended Effects ....................................34
　　　6.　　Plaintiff and Other Class Members Have Been Injured by the
　　　　　　Conspiracy ..............................................................................................35
　　　7.　　Defendants Concealed the Conspiracy and Plaintiff Did Not and
　　　　　　Could Not Have Discovered Defendants' Anticompetitive Conduct ........38

V.　　ANTITRUST INJURY & DAMAGES ........................................................................39

VI.　　CLASS ACTION ALLEGATIONS ...........................................................................40

VII.　　CLAIMS FOR RELIEF ...........................................................................................43

VIII.　　PRAYER FOR RELIEF ..........................................................................................80

IX.　　JURY DEMAND ......................................................................................................80

Plaintiff, the City of Arcadia, brings this class action individually and on behalf of a proposed class of indirect purchasers of fire trucks ("Class") under Section 1 of the Sherman Act against American Industrial Partners ("AIP"),[1] Oshkosh Corporation ("Oshkosh"), REV Group, Inc. ("REV Group"), Rosenbauer America LLC ("Rosenbauer"), and Fire Apparatus Manufacturers' Association ("FAMA") (collectively, "Defendants"), and other unnamed co-conspirators. Plaintiff seeks treble damages, injunctive relief, and other relief pursuant to federal and state antitrust laws for the anticompetitive conduct alleged herein. Plaintiff demands a trial by jury on all triable matters.

## I.  NATURE OF THE CASE

1.  To protect the public and property during natural disasters and other emergency crises, fire stations must have reliable, fully functioning fire trucks (or "fire apparatus") readily available. Fire apparatus provide the core operational capabilities of fire departments by delivering personnel, water, tools, and life-safety equipment required to mitigate fires, rescue victims, and stabilize emergency situations. Defendants' strategic conduct to consolidate the market, charge supra-competitive prices, and backlog delivery of new fire apparatus has diminished the availability of fire trucks, impairing firefighters' ability to respond effectively and leaving the public less protected during fires and other emergencies.

2.  Defendants are private-equity firm AIP, fire truck manufacturers REV, Oshkosh, and Rosenbauer, and industry group FAMA.

3.  AIP founded and controlled REV Group, the largest truck manufacturer in the United States. AIP managed to maintain their dominance by executing a series of acquisitions in the mid-2010s that consolidated the fire truck market. Oshkosh and Rosenbauer followed REV Group's lead, contributing to industry-wide consolidation with their own series of acquisitions.

4.  Defendants REV Group, Oshkosh, and Rosenbauer manufacture and supply fire trucks that are sold across the United States. Together, Defendants control 70-80% of the United States fire truck market. While REV Group, Oshkosh, and Rosenbauer (collectively,

---

[1] "AIP" collectively refers to American Industrial Partners, LLC, American Industrial Partners Capital Fund IV, LP, American Industrial Partners Capital Fund IV (Parallel), LP, AIP/CHC Holdings, LLC.

"Manufacturer Defendants") are direct competitors, they work together to wield their dominant market power to unlawfully restrict fire truck supply, thereby raising fire truck prices to supra-competitive levels. Beginning as early as January 2016, Defendants entered into an agreement, combination or conspiracy to limit the supply, and to fix, raise, maintain, or stabilize prices of fire trucks sold in the United States at supra-competitive levels. Defendants' anticompetitive conduct directly caused Plaintiff to pay artificially inflated prices for fire trucks, thereby sustaining antitrust injury in violation of federal and state antitrust laws.

5.      Over the last decade, the price of fire apparatus has doubled. A pumper truck, a vehicle affixed with a permanently mounted fire pump and water tank, that cost $500,000 in the mid-2010s now is priced at around $1 million. A ladder truck, an elongated vehicle affixed with a long, extendable, and mechanized ladder, was $900,000 in the mid-2010s but is now priced at $2 million. The surge in pricing goes well beyond what inflation would justify over the same period; or for that matter, what other ordinary supply and demand factors could explain.

6.      Along with the significant increase in prices, the fire truck industry has experienced significantly increased wait times for new fire trucks. What were once 18 month wait periods have now stretched to more than four years. Due to the delay, municipalities and other political subdivisions have no choice but to keep older and less reliable fire trucks in service, creating uncertainty in communities' fire protection systems and increasing public danger. Even for municipalities and other political subdivisions that have purchased new fire trucks, they have been forced to divert funds from other essential priorities to absorb the increased costs. As a result of the supra-competitive prices and delayed wait times, municipalities and other political subdivisions are negatively impacted by substantial pressure on their budgets and decreased community safety.

7.      The trade association, Fire Apparatus Manufacturers' Association ("FAMA"), is a key player in the industry and assisted in facilitating the conspiracy. Defendants and other fire truck manufacturers in the United States submit sensitive, private economic data to FAMA. FAMA sends the data to an outside consulting company, which incorporates the data into reports that are

2

then distributed privately to FAMA members, including Defendants. FAMA also provides a forum for Defendants to communicate with each other directly during member-only meetings.

8. The information submitted to FAMA is not publicly available and includes data that competitors would not ordinarily share under normal, competitive market conditions. Defendants rely on the sensitive economic data, compiled and redistributed through FAMA reports, to coordinate price increases and restrict supply. These FAMA reports also function as a monitoring mechanism, allowing Defendants and their co-conspirators to track one another's conduct and enforce continued adherence to the understanding, agreement, and conspiracy.

9. Defendants have consistently increased their margins by several percentage points and boosted overall profits, all without concern that their competitors would try to steal market share. Additionally, Defendants are not concerned with an outsider to the conspiracy undermining it because high barriers to entry prevent new competitors from coming into the market.

10. Rather than compete normally or attempt to meet demand where a competitor could not, Defendants instead coordinated to restrict supply, fix prices, and deliberately drive-up costs for municipalities and other political subdivisions.

11. Plaintiff purchased Defendants' fire trucks, who dominated and controlled the relevant market, within the Class Period (defined *infra*). Plaintiff contends that the Defendants entered into an agreement, combination or conspiracy to limit the supply, and to fix, raise, maintain, or stabilize prices of fire trucks sold in the United States at supra-competitive levels. As a result of Defendant's anticompetitive conduct, Plaintiff paid artificially inflated prices for fire trucks. These prices went beyond the prices they would have paid in a competitive market. Plaintiff suffered antitrust injury for which Plaintiff now seeks treble damages and injunctive relief.

## II. PARTIES

### A. Plaintiff City of Arcadia

12. Plaintiff City of Arcadia is a political subdivision that purchased at least one fire truck or apparatus directly or indirectly from Defendants and/or their co-conspirators during the Class Period (defined *infra*).

13.     The name "Arcadia" originates from the ancient Greek region in the central Peloponnese peninsula, surrounded by a mountainous landscape, with large valleys and foothills.[2] Ancient Arcadians "lived simple lives, untouched by the progress that marked the rest of Greece" and thus classical literature and myth painted Arcadia as an idyllic, pastoral paradise and "a symbol of ideal simplicity, rural beauty, and contentment."[3]

14.     Much alike its ancient namesake, the city of Arcadia, California is situated at the foothills of the San Gabrel Mountains, with natural, hilly landscapes and open green spaces. Originally inhabited by the Tongva Indians, and later part of the original Mission San Gabriel Arcángel, Arcadia was formally incorporated within Los Angeles County by Elias Jackson "Lucky" Baldwin (also the city's first mayor) in 1903. It was notoriously "known as being 'wide open,' with entertainment available 24 hours a day, seven days a week" with a reputation of "lawlessness and political turmoil."[4] In the years after incorporation, Arcadia became an early agricultural center with chicken and horse ranches and fruit groves.[5] Over time, agriculture gave way to residential growth, aided by substantial infrastructure projects transforming Arcadia into a suburban community.[6]

15.     Arcadia's "City of Homes" motto emerged in the 1930s as the City's first residential subdivisions were constructed, slowly featuring tree-lined streets and suburban tranquility.[7] Currently, the city hosts some 54,472 residents.[8] Arcadia is home to Santa Anita Park (which holds some of the most prominent horse racing events in the United States) and the Los Angeles County Arboretum and Botanic Garden (formerly part of the estate of Lucky Baldwin).

16.     Committed to environmental stewardship and urban forestry, Arcadia has been designated a Tree City USA community by the Arbor Day Foundation 30 times, meeting various

---

[2] https://yesterdaysamerica.com/what-does-the-name-arcadia-mean/
[3] https://kids.britannica.com/students/article/Arcadia/272935
[4] https://arcadiahistoricalsociety.org/arcadia-history/
[5] Id.
[6] https://www.britannica.com/place/Arcadia-California
[7] Arcadia General Plan – November 2010, Chapter 2: Land Use and Community Design Element, https://cms9files.revize.com/arcadia/Shape%20Arcadia/Development%20Services/general%20plan/Land%20Use%20Element%20Update%20Final.pdf
[8] https://www.census.gov/quickfacts/fact/table/arcadiacitycalifornia/INC110223

tree care and management standards.[9] The program celebrates communities that maintain a dedicated tree board or department, enact and enforce tree ordinances, and allocate annual funding for tree resources.[10] Additionally, Arcadia has earned the Tree City USA Growth Award twice, a distinction for outstanding tree care practices and enhanced community engagement in sustaining and improving urban forest resources.[11] These recognitions underscore Arcadia's sustained investment in urban and rural forestry, important in continuing fire-prevention responsibilities, emergency-response readiness, and the protection of residential neighborhoods.

17.    The City of Arcadia provides fire protection, emergency medical services, and a broad range of emergency response functions through the Arcadia Fire Department, a full-service municipal department.[12] In addition to fire suppression, the Department performs advanced life-support emergency medical response, hazardous-materials mitigation, rescue operations, and coordinated responses to traffic collisions and other public safety emergencies. To date, the Department responded to more than 5,900 calls for service, the substantial majority of which involved rescue and emergency medical services, along with responses to fires, hazardous conditions, service calls, and other public safety emergencies in 2025.[13] The Department's Fire Operations division, through its Apparatus and Equipment Division, is responsible for the purchase, maintenance, and operational readiness of all fire vehicles and firefighting equipment, including fire pumpers, aerial ladder trucks, rescue ambulances, command vehicles, an urban search and rescue vehicle, utility trucks, and related support apparatus.[14] These vehicles and associated equipment are essential to the Department's ability to carry out emergency response, fire prevention, and public safety operations throughout the City's varied terrain.

---

[9] https://www.arborday.org/our-work/tree-city-usa
[10] *Id.*
[11] https://www.arborday.org/our-work/tree-city-usa/growth-award
[12] https://www.arcadiaca.gov/protect/fire_department/index.php
[13] Arcadia Fire Department Weekly Report November 30-December 6, 2025, https://cms9files.revize.com/arcadia/Protect%20Arcadia/Fire/Weekly%20Reports/Nov2025/Arcadia%20Fire%20Department%20Weekly%20Report%20November%2030-December%206,%202025.pdf?t=202512111145070&t=202512111145070
[14] https://www.arcadiaca.gov/protect/fire_department/fire_operations.php

B.    **Defendants**

1.    **American Industrial Partners (AIP)**

18.    American Industrial Partners, LLC is a Delaware limited liability company with its principal place of business in New York, New York.[15]

19.    AIP is a private equity firm and as of December 2024, they have acquired and managed over $16 billion of assets on a discretionary basis and over $170 million in assets on a non-discretionary basis.[16] AIP focuses on buying and improving industrial businesses with operations in the U.S., Canada, and other developed markets.[17] AIP deals with acquisitions, corporate divestitures, management buyouts, recapitalizations, and going private transactions of established businesses with sales greater than $500 million.[18]

20.    AIP is not the typical passive capital investor, but rather AIP is "operationally-oriented" and uses a hands-on approach in the businesses it acquires.[19] Typically, AIP targets privately held companies with leading market positions and value creation opportunities through M&A and industry consolidation.[20]

21.    AIP created REV Group and controlled the company from 2006 to March 2024.[21] AIP used an assortment of related AIP entities, including investment funds which operate as limited partnerships to carry out REV Group's business affairs and further their anticompetitive

---

[15] *AIP LLC Form ADV* (Mar. 31, 2025), https://reports.adviserinfo.sec.gov/reports/ADV/156878/PDF/156878.pdf
[16] *AIP LLC Part 2 Brochure* (Mar. 31, 2025), https://files.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=968199
[17] *American Industrial Partners, About AIP,* https://americanindustrial.com/about/#:~:text=OUR%20CAPITAL%20BASE,funds%20and%20in%20every%20transaction
[18] *Id.*
[19] *AIP LLC Part 2 Brochure* (Mar. 31, 2025), https://files.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=968199
[20] *Id.*
[21] *Investing.com*, Rev group sees $127.6 million in stock sold by American Industrial Partners (Mar. 15, 2024), https://www.investing.com/news/stock-market-news/rev-group-sees-1276- million-in-stock-sold-by-american-industrial-partners-93CH-3340665

6

exclusionary scheme. AIP continues to hold an interest in REV Group through a related holding company.[22]

22.     Defendant American Industrial Partners Capital Fund IV, LP ("AIP Fund IV") is a Delaware limited partnership with its principal place of business in New York, New York.[23] From 2006 to March 2024 AIP Fund IV had an ownership interest in REV Group.[24]

23.     Defendant American Industrial Partners Capital Fund IV (Parallel), LP ("AIP Parallel Fund") is a Delaware limited partnership with its principal place of business in New York, New York.[25] During the relevant period, through 2024, AIP Parallel Fund had an ownership interest in REV Group.[26]

24.     Defendant AIP/CHC Holdings, LLC ("AIP Holdings" and together with the AIP Fund IV and AIP Parallel Fund, the "AIP Funds") is a Delaware limited liability company with its principal place of business in New York, New York.[27] Since 2006 AIP Holdings had an ownership interest in REV Group.

25.     In 2008, AIP acquired REV Group's predecessor company and maintained control over REV Group through its related funds and entities until 2024.

26.     Between 2006 to 2024, AIP directed or conspired with REV Group to acquire competing fire apparatus manufacturers across the United States. By acting jointly, AIP Defendants committed overt acts to advance AIP's anticompetitive scheme. AIP and the AIP

---

[22] *Id.*

[23] *AIP LLC Form ADV* (Mar. 31, 2025), *supra* note 15.

[24] *American Industrial Partners, Portfolio, REV,* https://americanindustrial.com/project/rev-2/; REV Group Sees $127.6 million in Stock Sold by American Industrial Partners, Investing.com (Mar. 15, 2024), https://www.investing.com/news/stockmarket-news/rev-group-sees-1276-million-in-stock-sold-by-american-industrial-partners-93CH-3340665 (last visited Nov. 18, 2025)

[25] *AIP LLC Form ADV* (Mar. 31, 2025), *supra* note 15; AIP Fund IV, SEC Form 4 (Feb. 20, 2024), https://www.sec.gov/Archives/edgar/data/1390368/000095010324002438/xslF345X05/dp20704 0_4-aipcf4lp.xml

[26] *See,* e.g., REV Group Form 10-K 2023, https://www.sec.gov/Archives/edgar/data/1687221/000095017023069876/revg-20231031.htm; REV Group Form 10-K 2024, https://www.sec.gov/Archives/edgar/data/1687221/000095017024135208/revg-20241031.htm

[27] *AIP/CHC Holdings, LLC, Delaware Entity Details; AIP Fund IV*, SEC Form 4, *supra* note 25.

Funds provided funds to enhance, extend, and ensure REV Group's market power and obtained financial rewards as a result.

27.     Since 2024, AIP has maintained a beneficial interest in REV Group through AIP Holdings and thus continues to derive a financial benefit from AIP's exclusionary scheme.

### 2.     REV Group, Inc.

28.     REV Group, Inc. ("REV Group") is a Delaware Corporation with its principal place of business in Brookfield, Wisconsin.[28]

29.     REV Group manufactures fire trucks and operates under multiple well-known brand names, including E-ONE, Inc. ("E-ONE"), Kovatch Mobile Equipment Corporation ("KME"), Ferrara Fire Apparatus ("Ferrara"), Spartan Emergency Response and Spartan Fire Apparatus and Chassis (collectively "Spartan"), Smeal Fire Apparatus ("Smeal"), and Ladder Tower Company ("Ladder Tower").[29]

30.     Nationwide, 113 dealers sell fire trucks from these REV Group brands. Additionally, REV Group sells Spartan cabs and chassis to approximately 40 smaller builders.[30]

31.     REV Group operates manufacturing plants in Ocala, Florida (E-ONE apparatus); Hamburg, New York (stainless steel E-ONE products); Nesquehoning, Pennsylvania (KME apparatus); Ephrata, Pennsylvania (Ladder Tower, KME, and Ferrara apparatus); Brandon, South Dakota (Spartan Pumps); Charlotte, Michigan (Spartan cabs and chassis); Snyder, Nebraska (Smeal apparatus); and Holden, Louisiana (Ferrara apparatus).[31]

---

[28] REV GROUP, INC. SEC FORM 10K, (Oct. 31, 2023), https://investors.revgroup.com/%7E/media/Files/R/Rev-IR/Annual%20Reports/rev-annual-report-2023.pdf.

[29] *Rev Group Invests in Its Ephrata Facility to Increase Aerial and TDA Apparatus Production*, FIREAPPARATUSMAGAZINE.com (Feb. 28, 2023), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-its-ephrata-facility-to-increase-aerial-and-tda-apparatus-production

[30] Chris Mc Loone, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands

[31] *Who We Are*, REVGROUP.COM, https://revgroup.com/who-we-are

32.     REV Group adopted an aggressive acquisition strategy as it acquired many independent fire apparatus manufacturers into a single corporate group.[32] As a result, REV Group established itself as the dominant supplier in the market.[33] Of the annual fire truck sales in the United States, REV Group captures approximately 33% of total sales.[34] In 2024, REV Group's full year net income was $257.6 million.[35]

33.     Throughout the Class Period (defined *infra*), REV Group conspired with AIP to consolidate the fire truck market. Further, REV Group subsidiaries were members of FAMA and sold fire trucks in compliance with the alleged conspiracy to fix, raise, maintain, or stabilize the prices of fire trucks in the United States.

### 3.     Oshkosh Corporation

34.     Oshkosh Corporation ("Oshkosh") is a Wisconsin Corporation with its principal places of business in Oshkosh, Wisconsin.[36]

35.     Oshkosh sells its products in more than 150 countries under a variety of brand names, including JLG Industries, Inc., JerrDan LLC, Hinowa S.p.A, AUSACORP S.L., Oshkosh AeroTech, McNeilus Companies, Inc., Oshkosh Commercial Products, LLC, Iowa Mold Tooling Co., Inc., Max-Metal, Inc., Kewaunee Fabrications, LLC, Oshkosh Defense, LLC, and Pratt & Miller Engineering & Fabrications, LLC.[37]

36.     Pierce Manufacturing, Inc. ("Pierce") is a wholly owned subsidiary of Oshkosh Corporation and is Oshkosh's leading North American brand. Pierce is incorporated in Delaware

---

[32] *Letter from Senator Elizabeth Warren and Senator Jim Banks to Edward Kelly, General President*, International Association of Fire Fighters (Apr. 15, 2025), https://www.warren.senate.gov/imo/media/doc/_firefighters.pdf ("Warren Letter").
[33] *Letter to FTC and DOJ re Firetrucks*, ECONOMICLIBERTIES.US (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf.
[34] *Id.*
[35] Julie Nuernberg, *REV Group, Inc. Reports Strong Fiscal 2024 Fourth Quarter and Full Year Results*, REVGROUP.COM, (Dec. 11, 2024), https://revgroup.com/rev-group-inc-reports-strong-fiscal-2024-fourth-quarter-and-full-year-results
[36] OSHKOSH CORP., FORM 10-K at 3, https://www.investors.oshkoshcorp.com/media/document/cdffc8d8-7620-48f8-9d1a-b5430d2b7d47/assets/2024_Oshkosh_Annual_Report_web.pdf
[37] *Id.* at 6.

and is headquartered in Appleton, Wisconsin. They produce custom and commercial pumpers, aerials, rescue trucks, wildland trucks, mini pumpers, and other fire apparatus in its manufacturing facilities in Appleton, Wisconsin and Bradenton, Florida.[38] Pierce has 26 dealers across California, Colorado, Florida, Kansas, Massachusetts, Minnesota, Mississippi, New Jersey, New York, Oregon, Pennsylvania, South Carolina, Texas, Virginia, and Wisconsin. Together, this dealer network sells fire trucks to customers in all 50 states.[39]

37.    Oshkosh, including through Pierce, adopted an aggressive acquisition strategy as it acquired many independent fire apparatus manufacturers into a single corporate group and captures around $750 million in annual fire truck sales in the United States, or at least 25% of the total.[40] Pierce has an annual revenue of approximately $1 billion. Oshkosh's reported 2024 fourth quarter net income was $153.1 million.[41]

38.    Throughout the Class Period, Oshkosh and Pierce were members of FAMA and sold fire trucks across the United States pursuant to a conspiracy to fix, raise, maintain, or stabilize the prices of fire trucks in the United States.

### 4.    Rosenbauer America LLC

39.    Rosenbauer America LLC ("Rosenbauer") is a wholly owned subsidiary of Rosenbauer International AG ("Rosenbauer International"), a publicly traded company based in

---

[38] *Pierce Manufacturing Joins Oshkosh Corporation to Showcase the Future of Electric Firefighting Technology at CES 2025*, FIREAPPARATUSMAGAZINE.COM (Dec. 23, 2024), https://www.fireapparatusmagazine.com/industry-news/pierce-joins-oshkosh-to-showcase-the-future-of-electric-firefighting-technology-at-ces-2025/; *Tour of Pierce Manufacturing, Inc.*, R4.IEEE.ORG, https://r4.ieee.org/event/tour-of-pierce-manufacturing-inc/
[39] *Find a Dealer*, PIERCE.COM, https://www.piercemfg.com/find-a-dealer.
[40] Basel Musharbash, *Did a Private Equity Fire truck Roll-Up Worsen the L.A. Fires?, BIG BY MATT STOLLER* (Jan. 25, 2025), https://www.thebignewsletter.com/p/did-a-private-equity-fire-truck-roll (hereinafter "Musharbash").
[41] *Oshkosh Corporation Reports 2024 Fourth Quarter and Full Year Results*, OSHKOSHCORP.COM (Jan. 30, 2025), https://investors.oshkoshcorp.com/news/oshkosh-corporation-reports-2024-fourth-quarter-and-full-year-results/f1490807-bbcf-44b4-be51-56294a3276e3

Austria and listed on the Vienna Stock Exchange.[42] Rosenbauer is incorporated in Delaware and headquartered in Lyons, South Dakota.[43]

40.    Rosenbauer produces custom and commercial pumpers, heavy rescues, tenders, mini pumpers and light rescues, aerial ladders and platforms, and electric fire trucks.[44] Rosenbauer sells fire trucks to customers in all 50 states and has production facilities in Lyons, South Dakota; Wyoming, Minnesota; and Fremont, Nebraska. Rosenbauer has 24 dealers across Alabama, Arizona, California, Colorado, Florida, Georgia, Idaho, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Nevada, New Jersey, New Mexico, New York, North Carolina, Ohio, Pennsylvania, South Dakota, Texas, Utah, Washington, and West Virginia.[45]

41.    Rosenbauer captures approximately $307 million in United States fire apparatus sales annually,[46] or at least 10% of the market.[47]

42.    Throughout the Class Period, Rosenbauer sold fire trucks across the United States, was a FAMA member, and participated in a conspiracy to fix, raise, maintain, or stabilize the prices of fire trucks in the United States.

### 5.    Fire Apparatus Manufacturers' Association

43.    Fire Apparatus Manufacturers' Association ("FAMA") is a not-for-profit trade association for fire apparatus manufacturers, located in Ocala, Florida.[48] As of May 2025, FAMA had 55 manufacturer members, including REV Group brands E-One, Ferrara, KME, and Spartan;

---

[42] *Rosenbauer International Fully Acquires Rosenbauer America*, ROSENBAUER.COM (June 23, 2022), https://www.rosenbauer.com/en/12/rosenbauer-group/investor-relations/financial-news/financial-news-detail/nd/rosenbauer-international-uebernimmt-rosenbauer-america-vollstaendig

[43] *A Single-Source Provider for the US Fire Services*, ROSENBAUER.COM, https://www.rosenbauer.com/en/de/rosenbauer-group/company/locations/sales-and-service-locations/Rosenbauer-america-llc.

[44] FAMA.ORG, https://www.fama.org/members/company_profile/?id=99

[45] *Find a Dealer*, ROSENBAUERAMERICA.COM, https://rosenbaueramerica.com/find-a-dealer

[46] *Rosenbauer International Fully Acquires Rosenbauer America*, ROSENBAUER.COM (June 23, 2022), https://www.rosenbauer.com/en/12/rosenbauer-group/investor-relations/financial-news/financial-news-detail/nd/rosenbauer-international-uebernimmt-rosenbauer-america-vollstaendig (converted to U.S. dollars from 262.9 million euros).

[47] Musharbash, *supra* note 40.

[48] *How to Join*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/how-to-join/

Oshkosh brand Pierce; and Rosenbauer.[49] John Schultz, the Vice President and General Manager of Pumper Products at Pierce, is FAMA's vice-chair.[50]

44.     FAMA acted as a co-conspirator of Defendants by facilitating the exchange of confidential, proprietary, and sensitive data among the other Defendants.

### 6.     Unnamed Defendants and Co-Conspirators

24.     Various other persons and entities, some of whose identities are presently unknown to Plaintiff, have participated as co-conspirators in the unlawful agreement to suppress production and fix the prices of fire trucks.

45.     These unnamed persons and entities performed acts and made statements in furtherance of the conspiracy, and Defendants are jointly and severally liable for the acts of all such co-conspirators, whether or not they are specifically named as defendants in this Complaint.

46.     Plaintiff reserves the right to name some or all of these entities as Defendants once their identities and precise roles become known through investigation and discovery.

### 7.     Agents and Affiliates

47.     Whenever this Complaint refers to any act, deed, or transaction of any corporation or other business entity, the allegation means that the corporation or business entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of its business or affairs.

48.     Each Defendant acted as the agent or joint venturer of, or for, the other Defendants with respect to the acts, violations, and common course of conduct alleged in this Complaint. The acts alleged were done through Defendants and their use of Defendants' subsidiaries, affiliates, divisions, or other related entities and through their respective officers, directors, employees, agents, or representatives, who were acting within the scope of their authority and for the benefit of their respective principals.

---

[49] *Members List*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/members/list
[50] *Data & Research Committee*, FIRE APARATUS MFRS. ASS'N, https://www.fama.org/data-researh-committee

12

49.     To the extent that any parent companies, subsidiaries, or affiliates of Defendants participated in, facilitated, or benefitted from the conduct alleged herein, Plaintiff reserves the right to name them as additional Defendants as their identities and roles become known through discovery.

### III.     JURISDICTION AND VENUE

50.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 because this action arises under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

51.     This Court also has jurisdiction over any supplemental state law claims under 28 U.S.C. § 1367, because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

52.     This Court has personal jurisdiction over Defendants pursuant to Federal Rule of Civil Procedure 4(k) and 15 U.S.C. § 22, which permits a lawsuit to be filed against a corporation in any district where the corporation may be found or transacts business and allows all process in such cases to be served in any district where the corporation may be found.

53.     This Court has personal jurisdiction over Defendants because they: (1) transacted business throughout the United States, including in this District; (2) have substantial contacts within the United States, including in this District; and/or (3) are engaged in an antitrust conspiracy that was and is directed at, and had and has the intended effect of causing injury to, persons residing in, located in, and/or doing business in the United States, including in this District.

54.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22, as well as 28 U.S.C. § 1391(b) and (c), in that at least one or more of the Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

13

## IV. FACTUAL ALLEGATIONS

### A. Fire Trucks

55. The product or products at issue in this litigation includes all fire trucks or fire apparatus. Fire trucks are specialized emergency vehicles that include pumpers, aerial trucks, and rescue units that are designed for use by fire departments and emergency services.[51]

56. "Fire trucks" as used in this case are those recognized by the National Fire Protection Association ("NFPA") Standard 1900 regarding automotive fire apparatus and the National Wildfire Coordinating Group Standards for Wildland Fire Resource Typing (together, the "Standards"). These Standards classify fire trucks within the United States into seven types, all of which are at issue in this case.[52]

57. **Type 1** fire trucks are commonly referred to as an engine company, engine pumper, or structural firefighting truck. This is the most common type of fire truck in use today. Type 1 fire trucks are deployed by and relied upon by all urban, suburban, and rural fire departments. Type 1 fire trucks carry all required NFPA firefighting equipment and support both structural firefighting and initial emergency medical services. Each Type 1 fire truck must be equipped with a pump with a minimum tank size of 300 gallons and 2.5 and 1.5-inch hoses of varying lengths. These trucks must also include ground ladders, nozzles, forcible entry equipment, rear access and egress, and some level of first aid equipment. Type 1 trucks are designed to carry four firefighters.

58. **Type 2** fire trucks carry all required NFPA firefighting equipment and support both structural firefighting and initial emergency medical services. They are commonly used in urban and suburban settings and typically carry three to four firefighters.

59. **Type 3** fire trucks, often referred to as a wildland fire truck or a brush truck, are typically used in wildland and rural settings. Pursuant to NFPA standards, a Type 3 engine must be equipped with a minimum of a 500-gallon water tank and a pump capable of a minimum of 150 US gallons per minute at a pressure of 250 pounds per square inch. Many Type 3 fire engines also

---

[51] REV Group Form 10-K 2024,
https://www.sec.gov/Archives/edgar/data/1687221/000095017024135208/revg-20241031.htm
[52] *Types of Fire trucks: An Overview and Comparison*, PIERCE (Nov. 14, 2023),
https://www.piercemfg.com/pierce/blog/types-of-fire-trucks

feature an auxiliary pump in addition to the main water pump. The auxiliary pump can be powered by a separate diesel engine that is connected to the pump. This pump-and-roll technique means that a truck operator can drive the truck while crew members man the pump and hoses, allowing firefighters to follow along as forest fires and brush fires move with the weather, and to create fire lines, wetting down areas ahead of an advancing wildfire. Type 3 Fire Engines are equipped to carry at least three passengers.

60.     **Type 4** fire trucks, like Type 3 trucks, are often used in wildland firefighting. Compared to Type 3 trucks, Type 4 trucks have a larger water tank and reduced hose capacity requirements. Type 4 fire trucks require a 750-gallon water tank that offers 50 gallons per minute of water transfer at a pressure of 100 pounds per square inch and must be equipped to carry at least two people.

61.     **Type 5, 6, and 7** fire trucks share many of the same design qualities. Typically, these vehicles are pick-up style, four-wheel drive, and medium duty chassis. The main difference between Type 5, Type 6, and Type 7 fire trucks is the difference in their maximum gross vehicle weight rating ("GVWR"): Type 5 trucks have a maximum GVWR of 26,000 pounds; Type 6 trucks have a maximum GVWR of 19,500 pounds, and Type 7 trucks have a maximum GVWR of 14,000 pounds. Type 5, 6, and 7 trucks typically carry a 300-gallon water tank and a small booster pump with a minimum capacity of 50 gallons per minute. Type 5, 6, and 7 trucks must be equipped to carry two firefighters.

62.     Some trucks are specially equipped to conform to additional standards. NFPA details some of these specialty trucks which include a Pumper Fire Apparatus, a Quint Fire Apparatus, a Mobile Foam Fire Apparatus, and an Aerial Fire Apparatus (which include trucks equipped with aerial ladders, elevating platforms or towers, and water tower devices).[53]

---

[53] *Types of Aerial Fire trucks: NFPA Classification Overview*, PIERCE (Nov. 8, 2022), https://www.piercemfg.com/pierce/blog/types-of-aerial-fire-truck

**FIGURE 1: Fire Truck Types**



| SPECS | STRUCTURE | | WILDLAND BRUSH TRUCKS | | | | |
|---|---|---|---|---|---|---|---|
| | TYPE 1 | TYPE 2 | TYPE 3 | TYPE 4 | TYPE 5 | TYPE 6 | TYPE 7 |
| TANK MIN. CAPACITY (GAL) | 300 | 300 | 500 | 750 | 400 | 150 | 50 |
| PUMP MIN. FLOW (GPM) | 1000 | 500 | 150 | 50 | 50 | 50 | 10 |
| @ RATED PRESSURE (PSI) | 150 | 150 | 250 | 100 | 100 | 100 | 100 |
| HOSE 2 ½" (MIN. FT) | 1200 | 1000 | ✕ | ✕ | ✕ | ✕ | ✕ |
| HOSE 1 ½" (MIN. FT) | 500 | 500 | 1000 | 300 | 300 | 300 | ✕ |
| HOSE 1" (MIN. FT) | ✕ | ✕ | 500 | 300 | 300 | 300 | 200 |
| LADDERS | ✓ | ✓ | ✕ | ✕ | ✕ | ✕ | ✕ |
| PUMP AND ROLL | ✕ | ✕ | ✓ | ✓ | ✓ | ✓ | ✓ |
| MAX. GVWR (LBS) | ✕ | ✕ | ✕ | ✕ | 26,000 | 19,500 | 14,000 |
| PERSONNEL (MIN.) | 4 | 3 | 3 | 2 | 2 | 2 | 2 |
| TYPICAL USES | STRUCTURAL FIRE RESPONSE | STRUCTURAL FIRE RESPONSE | BRUSH FIRE RESPONSE | BRUSH FIRE RESPONSE | INITIAL ATTACK, BRUSH PATROL | INITIAL ATTACK, BRUSH PATROL | PATROL, MOP UP, INITIAL ATTACK |

✓ REQUIRED   ✕ NOT REQUIRED/OPTIONAL

Source: *Types of Fire Trucks and Their Purpose*, BOISE MOBILE EQUIPMENT (Feb. 21, 2022), https://www.bmefire.com/types-of-fire-trucks

**B.    United States**

63.    Defendants sell fire trucks to fire departments across all 50 states.

**C.    Pre-2008 Overview of the Fire Truck Market**

64.    Before 2008, the U.S. fire truck manufacturing market consisted of small and midsized fire truck manufacturers producing emergency vehicles tailored to the needs of local fire departments. With at least two dozen manufacturers, free and open competition amongst these

16

smaller firms kept fire truck prices near costs and manufacturing capacity was sufficient to meet the market's demands.[54]

65.     For decades the fire truck industry enjoyed relatively stable prices and ample production capacity. The annual cost increase for new trucks prior to 2008 was around 3%, adjusted for inflation.[55]

66.     Once the Great Recession hit in 2008, municipal and other political subdivision budgets were exhausted, and demand for new fire trucks declined. By 2011, the market for new fire truck sales fell more than 40% from its peak,[56] from 5,000 a year to around 3,000 a year.[57] As a result, many independent fire truck manufacturers went out of business during this time. Demand for fire trucks remained relatively low until the mid-2010s.

###     D.     Consolidation of the Fire Truck Market: AIP and REV Group

67.     AIP took advantage of the economic uncertainty of 2008 and entered the fire apparatus manufacturing market. On August 5, 2008, AIP Fund IV's directly acquired the fire apparatus manufacturing company E-ONE. E-ONE produces brush trucks, pumpers, aircraft rescue, and firefighting vehicles.[58] E-ONE was the first fire truck manufacturer in AIP's portfolio and laid the foundation for AIP's deliberate consolidation of the fire truck market.

68.     In the mid-2010s, AIP focused on rolling up the fire truck industry. On August 24, 2010, AIP created Allied Specialty Vehicles (later changed its name to REV GROUP in 2015) from the merger of three other companies, including E-ONE.[59] AIP, through REV Group,

---

[54] Letter to FTC and DOJ re Firetrucks, ECONOMICLIBERTIES.US (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf; Musharbash, *supra* note 40.

[55] *Id.*

[56] Paul C. Darley, *The Fire Apparatus Market is Coming Back… Just Look at the Data*, FAMA.ORG (Dec. 5, 2015), https://www.fama.org/forum_articles/the-fire-apparatus-market-is-coming-backjust-look-at-the-data/

[57] Musharbash, *supra* note 40.

[58] Chris Mc Loone, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/

[59] Mike Baker, Maureen Farrell & Serge F. Kovaleski, *As Wall Street Chases Profits, Fire Departments Have Paid the Price*, N.Y. TIMES (Feb. 17, 2025), https://www.nytimes.com/ 2025/02/17/us/fire-engines-shortage-private-equity.html (hereinafter "Baker, Farrell & Kovaleski"); AIP Announces the

17

continued to acquire other fire truck manufacturers to cement their position as the dominant firm in the industry.

69.     In 2016, REV Group purchased Kovatch Mobile Equipment Corporation ("KME").[60] KME is headquartered in Nesquehoning, Pennsylvania and operates in California, New York, Pennsylvania, and Virginia. It produces a broad array of fire apparatus, including pumpers, aerials, and tankers.[61]

70.     In April 2017, REV Group acquired Ferrara Fire Apparatus, Inc. ("Ferrara"), based in Holden, Louisiana. The Ferrara products included custom chassis pumpers, aerials, and industrial apparatus. At the time, Ferrara had more than 450 employees and annual revenue of approximately $140 million.[62] Prior to the purchase, Ferrara had been a key competitor to E-ONE in the southern United States.[63]

71.     Dan Peters, President of the fire division at REV Group, noted that "the addition of Ferrara to the REV Fire Group enable[d] a number of new growth opportunities including expansion of our reach nationwide and adding new geographical regions and key accounts."[64] Timothy Sullivan, REV Group's CEO, confirmed that "Ferrara will immediately contribute

---

Formation of Allied Specialty Vehicles, Inc., American Industrial Partners (Aug. 24, 2010), https://americanindustrial.com/american-industrial-partners-announces-theformation-of-allied-specialty-vehicles-inc-a-leading-manufacturer-of-specialty-vehicles-in-northamerica/

[60] *REV Group Acquires Kovatch Mobile Equipment*, REVGROUP.COM (Apr. 11, 2016), https://investors.revgroup.com/investor-releases/2016/11-04-2016; Chris Mc Loone, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire- apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/; *KME Fire Apparatus Sold REV Group*, FIREHOUSE.COM (Apr. 22, 2016), https://www.firehouse.com/apparatus/press-release/12193362/fire-apparatus-manufacturer-kme- kovtach-pumpers-aerials-heavy-rescue-fire-apparatus-builder-kme-fire-apparatus-sold-to- revgroup

[61] Chris Mc Loone, *REV Group, Inc. Acquires KME*, FIREAPPARATUSMAGAZINE.COM (Apr. 11, 2016), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-inc-acquires-kme/

[62] *REV Group Acquires Ferrara Fire Apparatus, Inc.*, FIREAPPARATUSMAGAZINE.COM (Apr. 25, 2017), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-ferrara-fire-appartus/

[63] Chris Mc Loone, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/; *REV Group Acquires Ferrara Fire Apparatus*, Inc., REVGROUP.COM (Apr. 25, 2017), https://investors.revgroup.com/investor-releases/2017/04-25-2017-182251523

[64] *REV Group Acquires Ferrara Fire Apparatus, Inc.*, FIREAPPARATUSMAGAZINE.COM (Apr. 25, 2017), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-ferrara-fire-appartus/

18

strategic value by expanding the REV Fire Group national footprint, dealer sales network, service and after-market parts revenue as well as enhancing our robust line of custom chassis and aerial products for multiple market segments."[65] Sullivan also commented "[w]e now have the largest portfolio of Fire apparatus of any competitor in the United States, which means that we can effectively bid on everything that's out there."[66]

72.     By this time, REV Group amassed substantial market power. REV Group's subsidiaries included E-ONE, KME, and Ferrara - each a major fire apparatus brand in its own right. Yet AIP was not satisfied and continued to acquire fire apparatus manufacturers to further consolidate the market.

73.     In 2020, REV Group purchased Spartan Emergency Response and Spartan Fire Apparatus and Chassis (collectively "Spartan"), Smeal Fire Apparatus ("Smeal"), and Ladder Tower Company ("Ladder Tower").[67] These brands had a significant presence in the Midwest market.

74.     These acquisitions established REV Group as the top fire truck manufacturer in the United States. Under AIP's direction, REV Group used its dominant market power to get rid of competition in the industry. Although REV Group executives initially made a show of preserving the independence of the company's subsidiary manufacturers and their dealers, they were also quick to emphasize that aggressive or "negative" competition among subsidiaries would not be tolerated.[68]

[65] *Id.*

[66] REV Group Inc. Q2 Earnings Call Transcript (2017), https://seekingalpha.com/article/4079627-rev-groups-revg-ceo-tim-sullivan-on-q2-2017-results-earnings-call-transcript.

[67] Chris Mc Loone, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/; *Rev Group, Inc. Completes Acquisition of Spartan Emergency Response*, REVGROUP.COM (Feb. 3, 2020), https://investors.revgroup.com/investor-releases/2020/02-03- 2020-135942281

[68] Musharbash, *supra* note 40.

**FIGURE 2: Logos of Fire Apparatus brands acquired by REV Group by 2020**

      

Source: *REV Group, Inc. Presentation – July 2021*, REV GROUP (July 2021),
https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-
presentation-july-2021.pdf

75.      By 2021, REV Group clearly dropped its facade of subsidiary independence. A REV Group investor presentation called REV Group "an industry consolidator." That same presentation highlighted the company's "history of consolidation," "continued industry consolidation," "entrenched channel partners," and a record "2.3B backlog" as indicators of strong financial performance.[69] It also revealed their strategy that called for REV Group's subsidiaries to "[c]onverge on common designs that can be shared across brands." REV Group also ensures its larger fire department customers deal directly with corporate-level staff rather than individual brand representatives.[70] The presentation further called for the elimination of geographic overlaps between the marketing of its different fire truck brands and dealers. REV's fire apparatus operations are now "center-led," with REV Group dictating and managing the execution of "margin improvement actions" across its subsidiaries.[71]

76.      REV Group expressed its goal to double the fire apparatus companies' profitability to its shareholders. Timothy Sullivan, REV Group's CEO, told analysts that REV Group companies had profit margins of 4 to 5 percent, and that REV Group was on a path "to get all of them above that 10 percent level." Sullivan further explained: "You bring them into the fold, you got to give them the religion, and they've got it now."[72]

---

[69] *REV Group, Inc. Presentation – July 2021*, REV GROUP (July 2021), https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-presentation-july-2021.pdf

[70] Chris Mc Loone, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/

[71] Musharbash, *supra* note 40.

[72] Baker, Farrell & Kovaleski, *supra* note 59.

20

77. AIP and REV Group's consolidation of fire truck manufacturers has significantly decreased competition across the fire truck manufacturing industry, to the detriment of consumers and public safety.[73]

**E.    Consolidation of the Fire Truck Market: Oshkosh**

78. Oshkosh followed in REV Group's footsteps by making several acquisitions of its own.

79. In 2021, Oshkosh's primary North American subsidiary, Pierce, announced that it had acquired Boise Mobile Equipment ("BME").[74] BME's product portfolio allowed Pierce to expand its scope to West Coast markets. BME products included fire apparatus like the Model 34, Tactical Tender, and Type 6 Xtreme.[75] In 2022, Oshkosh acquired a designer and manufacturer of custom fire trucks, Maxi-Metal, Inc.[76] As a result of these acquisitions, Oshkosh gained control of a full quarter of the U.S. fire truck market.

80. In addition to purchasing third-party manufacturers, Oshkosh also embarked on a strategy of consolidating the U.S. brands already within its purview, reducing geographic overlap between dealers. In July 2018, MacQueen Emergency Group ("MacQueen"), a Pierce subsidiary,

---

[73] Sounding the Alarm: America's Fire Apparatus Crisis: Hearing Before the Subcomm. on Disaster Mgmt, D.C. & Census of the S. Comm. on Homeland Sec. & Gov't Affs, 119th Cong. (2025) (testimony of Basel Musharbash, Principal Attorney, Antimonopoly Counsel), https://www.hsgac.senate.gov/wp-content/uploads/Musharbash-Testimony.pdf

[74] *Pierce Manufacturing Completes Ownership Interest in Boise Mobile Equipment*, OSHKOSHCORP.COM (Sept. 16, 2021), https://www.investors.oshkoshcorp.com/news/pierce-manufacturing-completes-ownership-interest-in-boise-mobile-equipment/16c54803-9007-4e9e- 82f2-e6253396d4e0/

[75] *Pierce Completes Ownership Interest in BME*, FIREHOUSE.COM (Sept. 16, 2021), https://www.firehouse.com/apparatus/press-release/21238596/pierce-manufacturing-custom-fire-truck-builder-pumpers-ladders-quints-rescues-puc-enforcer-pierce-completes-ownership-interest-in-bme; *Pierce Manufacturing Completes Ownership Interest in Boise Mobile Equipment*, PIERCEMFG.COM (Sept. 16, 2021), https://www.piercemfg .com/pierce/press-release/pierce-manufacturing-completes-ownership-interest-in-boise-mobile

[76] *Oshkosh Corporation Acquires Maxi-Metal, Inc*., OSHKOSHCORP.COM (June 13, 2022), https://www.investors.oshkoshcorp.com/news/oshkosh-corporation-acquires-maxi-metal-inc/c5afbb77-38ec-4497-a391-f4f56b88d127/

acquired Schuhmacher Fire Equipment. This move expanded MacQueen's dominance across the upper Midwest, including Minnesota, Nebraska, South Dakota, North Dakota, and Missouri.[77]

81.    In January 2019, Pierce dealer Siddons-Martin Emergency Group ("Siddons") acquired Superior Equipment, consolidating control over the American Southwest including Texas, Louisiana, New Mexico, Utah, and Nevada.[78]

82.    In November 2019, Pierce dealer Allegiance Fire and Rescue ("Allegiance") acquired Minuteman Fire and Rescue. With this acquisition, Allegiance's territory encompassed most of New England, including Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont.[79]

83.    In September 2023, Pierce dealer Firematic Supply Co. Inc. ("Firematic") acquired Churchville Fire Equipment. The acquisition expanded Firematic's control over Connecticut and New York.[80]

84.    On June 12, 2025, Pierce's Reliant Fire Apparatus brand ("Reliant") acquired Halt Fire, Inc., broadening Reliant's "exclusive Pierce territory" to include Michigan, in addition to its existing territories in Wisconsin and Iowa.[81] Pierce noted that Reliant would "align Michigan operations with its existing territories" to "ensur[e] a consistent and reliable customer experience."[82]

---

[77] *MacQueen Emergency Group Territory Expanded to Include 109 Missouri Counties*, PIERCEMFG.COM (July 10, 2018), https://www.piercemfg.com/pierce/press-release/macqueenemergency-group-territory-expanded-to-include-109-missouri-counties

[78] *Siddons-Martin Emergency Group Expands Territory with Acquisition of Superior Equipment*, PIERCEMFG.COM (Jan. 21, 2020), https://www.piercemfg.com/pierce/press-release/siddons-martin-emergency-group-expands-territory-with-acquisition-of-superior-equipment

[79] *Minuteman Fire and Rescue Acquire by Allegiance Fire and Rescue*, ALLEGIANCEFR.COM (Nov. 19, 2019), https://allegiancefr.com/minuteman-fire-and-rescue-acquired-by-allegiance-fire-and-rescue/

[80] *Pierce Dealer Firematic Supply Co. Grows Presence in Northeast with Acquisition of Churchville Fire Equipment*, PIERCEMFG.COM (Sept. 1, 2023), https://www.piercemfg.com/ pierce/press-release/pierce-dealer-firematic-supply-co.-grows-presence-in-northeast-with-acquisition-of-churchville-fire-equipment

[81] *Reliant Fire Apparatus Acquires Halt Fire, Inc. Expands Pierce Dealership Territory to Include the State of Michigan*, PIERCEMFG.COM (June 12, 2025), https://www.piercemfg.com/ pierce/press-release/reliant-fire-apparatus-acquires-halt-fire-inc.-expands-pierce-dealership-territory-to-include-the-state-of-michigan

[82] *Id.*

22

85.     These acquisitions have reduced or eliminated competition among Pierce subsidiaries. More prominently, these consolidations have largely had the effect of eliminating geographic overlaps and established Pierce's control over significant territories.

### F.     Consolidation of the Fire Truck Market: Rosenbauer

86.     Following the consolidation trend of REV Group and Oshkosh, in June 2022, Rosenbauer International A.G. acquired the remaining 25 percent minority stake in Rosenbauer American from General Safety Equipment Corporation.

87.     In March 2023, Rosenbauer announced that IKON Fire, LLC would join its dealer network for fire apparatus sales in Colorado and Wyoming.[83]

88.     Rosenbauer also assigns its dealers non-overlapping territories, minimizing competition among them.

### G.     Manufacturer Defendant's Collusion Minimizes Competition

89.     While Defendants actively consolidated the market, they simultaneously chose to collude with each other rather than compete. For example, REV Group's Vice President of Sales in the Fire Group, Mike Virnig, admitted to anticompetitive strategies: "What I won't tolerate is negative selling. I won't tolerate it **with our competitors**, and I won't tolerate it within the group. If I even get a hint or see anything like a dealer taking a shot at another dealer, we step in and say, 'Stop it.'"[84]

90.     REV Group company executives also explicitly informed analysts of their cooperation when they said that the company expected to "substantially raise its profit margins and that **other companies were doing the same**."[85]

---

[83] *Rosenbauer America, Rosenbauer Announces New Partnership with IKON Fire, LLC*, ROSENBAUERAMERICA.COM (Mar. 30, 2023), https://rosenbaueramerica.com/rosenbauer-announces-new-partnership-with-ikon-fire-llc/

[84] Chris McLoone, *REV Group Invests in the Strength of Fire Apparatus Brands*, FIREAPPARATUSMAGAZINE.COM (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/ (emphasis added).

[85] Mike Baker, *Senators Investigate Private Equity Role in Soaring Fire-Truck Costs*, N.Y. TIMES (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/private-equity-fire-trucks-congress-investigation.html (emphasis added.)

23

91.    Industry insider Jerry Halpin, the co-owner and vice president of sales and marketing for C.E.T. Fire Pumps, noted in 2022 that "people in the fire service industry are talking amongst themselves" and are looking "to **bolster opportunities through partnerships and other alliances**."[86] He also predicted "**cooperation between like businesses** to gain an edge in the marketplace."[87]

92.    Executives from these top fire truck manufacturers repeatedly emphasize "price discipline" across their companies. In 2017, Oshkosh CEO Wilson Jones told investors that "[w]e're certainly glad to see more companies consolidating especially publicly traded companies. We think that will help **drive better discipline** from a **pricing standpoint** in the markets."[88] Along the same vein in 2018, REV Group CEO Tim Sullivan stated that "[p]rices go up every year" and REV Group was "very pleased with the **discipline** within the fire and emergency markets."[89]

93.    Even in the more recent period from 2020-2025, the pattern of collusion over competition has persisted. The then-CEO of Oshkosh told investors "there could be some partnerships, potential JVs, there's a lot of conversation going on in the market today with **companies working more** together than in the past."[90] Jerry Halpin, co-owner and vice president of sales and marketing at C.E.T. Fire Pumps, "people in the fire service industry are talking amongst themselves . . . to bolster opportunities through partnerships and other alliances."[91] He

---

[86] *2022 Was Good for Fire Service Industry; 2023 Is Uncertain*, FIREAPPARATUS MAGAZINE.COM (Dec. 12, 2022), https://www.fireapparatusmagazine.com/fire-apparatus/2022- was-good-for-fire-service-industry-2023-is-uncertain (emphasis added).

[87] *Id.* (emphasis added).

[88] Mike Baker, Senators Investigate Private Equity Role in Soaring Fire-Truck Costs, N.Y. TIMES (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/private-equity-fire-trucks-congress-investigation.html (emphasis added).

[89] Oshkosh Corp. Q2 Earnings Call Transcript (2017), https://seekingalpha.com/article/4065631-oshkosh-osk-q2-2017-results-earnings-call-transcript (emphasis added).

[90] Oshkosh Corp. Q1 Earnings Call Transcript (2020), https://seekingalpha.com/article/4319880-oshkosh-corporation-osk-ceo-wilson-jones-on-q1- 2020-results-earnings-call-transcript (emphasis added).

[91] 2022 Was Good for Fire Service Industry; 2023 Is Uncertain, fireapparatusmagazine.com (Dec. 120, 2022), https://www.fireapparatusmagazine.com/fire-apparatus/2022-was-good-for-fire-service-industry-2023-is-uncertain (emphasis added).

predicted "cooperation between like businesses" as companies sought to "gain an edge in the marketplace."[92]

### H. Defendants use FAMA to exchange confidential, competitively sensitive information

94. REV Group's subsidiaries: E-ONE, Ferrara, KME, Spartan, Smeal, and Ladder Tower, along with Pierce Manufacturing and Rosenbauer constitute the dominant fire truck manufacturers in the United States. All are members of FAMA. FAMA facilitates collusion with the Defendants to enable an information exchange through statistical reports and by organizing twice-yearly in-person meetings.

#### 1. FAMA Statistical Reports

95. FAMA has created a space for fire truck manufacturers to share private, competitively sensitive information amongst themselves for coordination purposes. FAMA describes access to competitors' data as "one of the most valuable reasons" for companies to join the organization. FAMA has an entire committee, the Data & Research Committee, dedicated to enabling this data exchange. FAMA describes the Data & Research Committee's mission as helping to "strengthen FAMA member companies by providing actionable data," including economic data, "for strategic business planning."[93] The Committee is tasked with "collect[ing] and distribut[ing] data regarding apparatus sales and orders" and distributing it on at least a quarterly basis.[94] FAMA markets this "detailed data"[95] as "invaluable" to members "for their internal business purposes."[96]

---

[92] *Id.*

[93] *Data & Research Committee*, FIRE APARATUS MFRS. ASS'N, https://www.fama.org/data-research-committee.

[94] *Id.*

[95] Paul C. Darley, *The Fire Apparatus Market is Coming Back… Just Look at the Data*, FIRE APPARATUS MFRS. ASS'N (Dec. 4, 2015), https://www.fama.org/forum_articles/the-fire-apparatus-market-is-coming-backjust-look-at-the-data

[96] *Why Join?*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/why-join

**FIGURE 3: FAMA Data and Research Committee, "Mission" and "Objectives"**

## MISSION

The mission of the Data & Research Committee is to help strengthen FAMA member companies by providing actionable data for strategic business planning. This includes economic data, fire market trends, and apparatus sales and order statistics.

## OBJECTIVES

- To collect and distribute data regarding apparatus sales and orders on a quarterly basis

- To gather data from various sources that is helpful in business planning by member companies

Source: *Why Join?*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/why-join

**FIGURE 4: FAMA Membership, "Why Join"**

## ADDED BENEFITS

Among the most powerful benefits of FAMA membership are the statistical reports provided quarterly and encapsulated for every year-end. Only those companies that participate in the statistical studies and members are privy to these reports. FAMA does not release this information to the public. Members find this research invaluable for their internal business purposes.

Source: *Why Join?*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/why-join

96. Through FAMA's digital data portal, manufacturers, like Defendants, can enter their private, economic data. That data is then sent to an accounting firm, which compiles the data and returns it to the Data & Research Committee. The Committee then uploads the data as reports onto the FAMA website.

26

97.     The data is exclusively accessible to FAMA members only through a secure section of the FAMA website.[97] "FAMA does not release this information to the public."[98] "Only those companies that participate in the statistical studies and members are privy to these reports."[99]

98.     FAMA imposes strict limits on who can become a member, and consequently, who has access to these reports. To join FAMA, an entity must (a) be "engaged in the manufacture of firefighting or fire protection apparatus, including rescue vehicles," or (b) "manufacture components or products which are incorporated by the manufacturer as a permanent part of the completed fire apparatus . . . such as chassis, fire pumps, fire hoses, hose reels, ladders, aerial devices, apparatus valves and other water control appliances."[100] Notably, fire departments, municipalities, and other buyers of fire apparatus are not eligible to join FAMA under this definition and in turn are not privy to the data. Customers of apparatus manufacturers are similarly denied access to the data that manufacturers exchange among themselves.

99.     Even among its members, FAMA further restricts data access to those companies that provide their own data. FAMA states data access "may be denied" to any company "that was given the opportunity to participate in the program but refused."[101] Data may also be denied to any company "that does not agree in advance of participation to keep the results confidential."[102]

### 2.     FAMA Meetings

100.     FAMA also organizes twice-yearly meetings, in the spring and the fall, to "provide a forum [for members] to share information."

101.     At these meetings, attendees, including direct competitors, listen to presentations that include economic forecasts regarding the fire truck manufacturing market. Attendees also engage in "purchasing roundtables" and FAMA members-only meetings and discussion groups.

---

[97] *Why Join FAMA*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/wp-content/uploads/2019/01/10-Reasons-to-Join-FAMA-11-6-18.pdf

[98] *Why Join?*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/why-join

[99] *Id.*

[100] *Id.*

[101] *Data & Research Committee*, FIRE APARATUS MFRS. ASS'N, https://www.fama.org/data-research-committee

[102] *Id.*

102.     By hosting these meetings and discussions, FAMA orchestrated this competitively sensitive economic information exchange and coordination of supply restrictions and price hikes. FAMA markets these events as one of the reasons to join FAMA.

103.     In addition to the statistical reports and twice-yearly in-person meetings, FAMA "communicates with its members on a regular basis via emails, its website and an extensive FAMA newsletter."[103] These platforms offered other avenues for communication and coordination among Manufacturer Defendants.

## I.     The Conspiracy Resulted in Defendants Suppressing Supply and Raising Prices of Fire Trucks During the Class Period

### 1.     Fire Trucks Backlogs Soared by 40% or More During the Class Period

104.     Demand for fire trucks ramped up again in the mid-2010s. The demand increased steadily until 2020. Municipal and other political subdivision budgets were suddenly bolstered by COVID relief funds, and thus between 2020 and 2022, the number of fire truck orders spiked. Since about 2022, order activity has hovered between 5,500 and 6,500 trucks per year.

105.     However, Manufacturer Defendants' production fell behind the increased demand, with order backlogs ballooning. For example, REV Group reported a record $3.6 billion backlog in late 2023, a 41% increase over 2022.[104] REV Group's backlog has continued to increase. As of last October, REV Group had a $4.4 billion backlog on fire and emergency vehicle orders in the United States.[105]

106.     Oshkosh and Rosenbauer share similar backlogs. Oshkosh's backlog of fire truck orders quadrupled from 2019 to 2023, and it recently reported around $4 billion in orders placed

---

[103] *Why Join FAMA*, FIRE APPARATUS MFRS. ASS'N, 10-Reasons-to-Join-FAMA-11-6-18.pdf
[104] Reuters, *Fire truck Boom Highlights Divide in US Manufacturing*, U.S. NEWS (Jan. 19, 2024), https://money.usnews.com/investing/news/articles/2024-01-19/fire-truck-boom-highlights-divide-in-us-manufacturing
[105] REV GROUP, INC. SEC FORM 10K (Oct. 31, 2024), https://www.sec.gov/Archives/edgar/data/1687221/000095017024135208/revg-20241031.htm

but not fulfilled.[106] Rosenbauer announced an approximately $2.67 billion backlog as of the end of 2024.[107]

107. Increased backlogs have resulted in substantial delays prior to delivery of new fire trucks. Wait times in some areas have more than quadrupled, from one year to 4.5 years.[108] While orders spiked to 45% above average levels, order fulfillment dropped nearly 10% below average levels in 2022.[109]

108. While the rate of order fulfillment has slightly increased in recent years, it has not been nearly enough to mitigate the significant backlog plaguing the industry. See the graph below:

**FIGURE 5: Fire Apparatus Orders Booked versus Orders Shipped**



Source: *FAMA Releases Fire Apparatus Industry Update*, FIRE ENGINEERING (May 30, 2025), https://www.fireengineering.com/fire-apparatus/fama-releases-fire-apparatus-industry-update

[106] Baker, Farrell & Kovaleski, *supra* note 59.

[107] Christian Sandherr, *Rosenbauer International AG: Solid Start Into the Year // Record High Order Backlog*, NUWAYS (May 14, 2025), https://www.nuways-ag.com/company/rosenbauer-international-ag/research/solid-start-into-the-year-record-high-order-backlog ("Q1 sales grew by 16.8% yoy to € 264m (eNuW: € 265m) thanks to the company's strong order backlog of € 2.28bn at the end of FY24.").

[108] Letter to FTC and DOJ re Firetrucks, ECONOMICLIBERTIES.US (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf

[109] *FAMA Releases Fire Apparatus Industry Update*, FIRE ENGINEERING (May 30, 2025), https://www.fireengineering.com/fire-apparatus/fama-releases-fire-apparatus-industry-update

109. In addition to delays in acquiring new fire trucks, the waiting times for replacement part orders have similarly increased. For example, Gil Carpenter, a fire chief in Benton, Arkansas, explained that before REV Group acquired Ferrara, he was able to easily call a contact named Charlie whenever he needed a Ferrara replacement part. Charlie would ship the part the next day. But in 2024, when one of the department's vehicles needed replacement parts, delivery was delayed for more than 10 months. As a result, Mr. Carpenter's fire department was left without one of its eight trucks for nearly a year.[110]

110. These significant backlogs cannot be attributed to COVID-19-related supply chain disruptions or other geopolitical events of the early 2020s. In 2021 and 2022, COVID-19 related supply chain issues negatively impacted industries across the United States. However, the Federal Reserve Bank of New York's Global Supply Chain Pressure Index returned to baseline by early 2023, hitting its lowest point on record in May 2023.[111]

## 2. In the Face of Increasing Demand, Defendants Failed to Increase Capacity and Have Shuttered Facilities, Worsening the Shortage

111. Under normal competitive market conditions, such a steep rise in demand would naturally prompt manufacturers to expand their production capacity. Yet no such expansion has occurred. REV Group has recently spent an inconsequential amount, about 1 percent, on updating its buildings and equipment.[112] Notably, neither Oshkosh nor Rosenbauer has taken steps to meet this surge in demand or seize additional market share by ramping up their production. A former REV Group stock investor, Alexander Yaggy, accurately characterized the company's failure to expand manufacturing capacity amid rising demand as "reflective of an uncompetitive market."[113]

112. Not only have Defendants failed to expand their manufacturing capacity, in some cases they have completely shut down existing plants, reducing capacity further. In September of

---

[110] Baker, Farrell & Kovaleski, *supra* note 59.

[111] *Diccon Hyatt, Supply Chains Have Healed From Pandemic Disruptions*, INVESTOPEDIA (June 7, 2023), https://www.investopedia.com/supply-chains-have-healed-from-pandemic-disruptions-7509263.

[112] Baker, Farrell & Kovaleski, *supra* note 59.

[113] *Id.*

2021, REV Group closed two KME custom fire truck manufacturing facilities in Pennsylvania and Virginia.[114] The closure cut the company's manufacturing footprint by roughly one third.[115]

113. In a press release, REV Group stated that orders currently in progress at the two KME facilities would be transferred to other existing REV Group manufacturing plants.[116] Thus, the transition, unsurprisingly, resulted in additional, substantial delays.[117]

114. Notably, despite the unprecedented backlogs, Manufacturer Defendants appear unconcerned that their customers might cancel orders or that a competitor might steal their business.[118] This type of unbothered demeanor is a symptom of an anticompetitive market. Mark Skonieczny, REV Group's current chief executive, explained during a 2023 conference call that the company did not expect the delays to cause cancellations because once a city sets aside the money, it is "earmarked" and REV Group gets a deposit. "That money is allocated to those units, so we feel good about that."[119] Skonieczny further commented, "I don't think it's impacting our market share."[120] According to REV Group's SEC reports, the company considers its backlog to enhance its value to shareholders by giving the company "strong visibility into future net sales."[121]

115. Further, Manufacturer Defendants boast about their growing backlogs. In 2018, REV Group CEO Tim Sullivan said, "We like backlog, we love backlog. We like long backlogs that are out for months."[122] In 2019, Sullivan continued to cite "a record backlog level" as "an

---

[114] Chris Reber, *KME Plant to Close in April 2022*, TIMES NEWS ONLINE (Sept. 11, 2021), https://www.tnonline.com/20210911/kme-plant-to-close-in-april-2022
[115] Baker, Farrell & Kovaleski, *supra* note 59.
[116] Andrew Corselli, REV Group Announces Plans to Shift KME Production to Other REV Fire Group Facilities, FIRE APPARATUS & EMERGENCY EQUIPMENT (Sept. 10, 2021), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-announces-plans-to-shift-kme-production-to-other-rev-fire-group-facilities
[117] Baker, Farrell & Kovaleski, *supra* note 59.
[118] Musharbash, *supra* note 40.
[119] Baker, Farrell & Kovaleski, *supra* note 59.
[120] Eman Abu-Khaled, *REV Group Takes Steps to Normalcy After Supply-Chain Setbacks*, TRAILER BODY BUILDERS (Mar. 22, 2023), https://www.trailer-bodybuilders.com/truck-bodies/article/21262503/rev-group-takes-steps-to-normalcy-after-supply-chain-setbacks
[121] Musharbash, *supra* note 40.
[122] REV Group Inc. Q2 Earnings Call Transcript (2018), https://seekingalpha.com/stock-ideas/industrial-goods

31

encouraging sign."[123] In January 2020, Oshkosh also boasted about record backlogs, noting "[o]ur Fire & Emergency team posted a solid quarter characterized by strong order growth and an all-time high backlog."[124] And in a 2025 Investor Day presentation, Oshkosh explicitly highlighted its fondness for backlogs and their ability to grow revenue with a slide that reads: "Revenue growth supported by strong backlog."[125] The presentation also stated that they intended to further increase its profit margins to record levels through "[p]ricing realization from backlog":[126]

116.   Rather than behave competitively and make attempts to fill the gaps where supply does not meet demand, Defendants deliberately choose to coordinate and restrict supply to drive up prices. In a properly functioning competitive market, rational companies would boost production to meet rising demand, invest in and expand facilities, fight to fill the gaps and satisfy the needs of customers, and outperform competitors. But, in the fire truck market the opposite is seen. The dominant manufacturers are behaving anticompetitively with their parallel efforts to restrict supply despite growing demand.

**FIGURE 6: Oshkosh Investor Day Presentation, Revenue Growth Supported by Strong Backlog**




32

Source: *Oshkosh Corp. Investor Day Presentation* at 87 (2025),
https://online.flippingbook.com/view/29819025/

### 3. The Price of Fire Trucks Doubled During the Class Period

117. The growing demand and flat or declining supply created by Manufacturer Defendants naturally resulted in the cost of fire trucks soaring. In the mid-2010s, a standard pumper truck cost approximately $300,000 to $500,000.[127] Within the last few years, prices have increased to an average of $1 million per pumper truck.[128] Similarly, ladder trucks that cost $750,000 to $900,000 in the mid-2010s cost upward of $2 million today.[129] An industry leader commented that the industry has "reached a new level of price psychology. Today, relationships start at a half million dollars, and 10 years ago that was a remote concept."[130]

118. Customers have no realistic competitive alternatives when competitors coordinate their high prices and low output. Fire departments across the United States are left with no choice but to pay the artificially inflated prices Manufacturer Defendants are charging for their fire trucks.

### 4. Defendants used "Floating Prices" to Charge Even More

119. On top of already skyrocketing base prices for new fire trucks, Manufacturer Defendants have used the significant industry backlog to justify imposing "floating prices" on their customers. Defendants inappropriately leverage the alleged difficulty of projecting material costs over a years-long lead time as an excuse and have added "floating price" clauses to their contracts with Plaintiff and other Class members that allow Manufacturer Defendants to increase the final price of a fire truck after it goes into production. Due to production delays, this means Manufacturer Defendants can increase their prices years after a fire department initially makes an order for a truck at a "set" price. Mark Fusco, the president of Rosenbauer America, conceded that

---

[127] *Id.*

[128] *Id.*

[129] Chris Godfrey, *An Evaluation Of Fire Apparatus Usage And Operating Cost For Green Township Fire & Ems* at 9 (Aug. 2, 2013), http://www.ohiofirechiefs.com/aws/OFCA/asset_manager/get_file/77188; Baker, Farrell & Kovaleski, *supra* note 59; Jody Godoy, *As Fire truck Prices Hit $2 Million, US Firefighters Demand an Antitrust Probe*, REUTERS (May 13, 2025); Musharbash, *supra* note 40.

[130] Chris Mc Loone, *Fire Industry Outlook: 10 Years After the Great Recession*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Dec. 1, 2018), https://www.fireapparatusmagazine.com/fire-apparatus/fire-industry-outlook-10-years-after-the-great-recession

33

his company imposes "surcharges that might occur during the build times" on Rosenbauer customers.[131] Essentially, under these clauses, Defendants give themselves the predatory power to increase their prices years after a fire department makes its initial order. They essentially treat the purchase price as a mere base price that is subject to and likely to be increased over the long wait time.

120.    A fire department in Massachusetts fell victim to the predatory "floating price" clause. The fire department ordered a fire truck in 2022 and then in 2023 added two more trucks to their original order. After the second order, the fire truck manufacturer increased the price of the truck ordered in 2022 by $150,000 to match the price of the trucks ordered in 2023. The manufacturer threatened not to deliver the truck ordered in 2022 unless the fire department agreed to the price increase. The fire chief felt "compelled to pay this increase out of fear that the process to get apparatus would take too long and we would not be able to provide service to our community."[132] For another example, a fire department in Indiana was hit with a more than $100,000 price increase for the same pumper truck after a 7-month delay.[133] Similarly, in Colorado, the Loveland Fire Rescue Authority experienced a surcharge of $29,000 on a pending order.[134]

### 5.    Defendants' Conspiracy had the Intended Effects

121.    Defendants have reaped substantial profit increases from their conspiracy. Defendants' coordinated efforts to artificially raise, fix, maintain, or stabilize prices for fire trucks and to exchange competitively sensitive information regarding fire trucks has had the intended effect of artificially inflating the prices for fire trucks.

---

[131] Ed Ballam, *2022 Was Good for Fire Service Industry; 2023 Is Uncertain*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Dec. 20, 2022), https://www.fireapparatusmagazine.com/fire-apparatus/2022-was-good-for-fire-service-industry- 2023-is-uncertain
[132] Letter from Senator Elizabeth Warren and Senator Jim Banks to Edward Kelly, General President, International Association of Fire Fighters (Apr. 15, 2025), https://www.warren.senate.gov/imo/media/doc/_firefighters.pdf ("Warren Letter").
[133] *Id.*
[134] *"Floating" Prices & Lengthy Delivery Times for Fire Apparatus CSFC Members' Perspective* (Aug. 25, 2022), Floating+Prices+Lenghty+Delivery+Time+for+Fire+Apparatus+Aug+25+2022[42].pdf

34

122.     In July 2021, REV Group announced that it had "[e]xceeded consensus earnings estimates for five consecutive quarters."[135] In 2024, REV Group's profit margins jumped to what the company described as an "exceptional 8.9 percent" for the division that includes fire trucks.[136]

123.     In June 2025, Oshkosh stated that its adjusted operating margins had grown from 4.8% to 10.5% from 2022 to 2024, delivering on "key 2022 Investor Day targets one year early."[137]

124.     Oshkosh also stated that it anticipates its adjusted operating margins will grow to 12 or 14 percent by 2028, with revenue of $13-14 billion.,[138] revenue growth that will be "supported by strong backlog" and price increases.[139]

125.     These profit increases are industry wide. With only a few pandemic-related exceptions, overall revenues for U.S. fire truck manufacturers, including Manufacturer Defendants, have increased significantly since 2015.

### 6.     Plaintiff and Other Class Members Have Been Injured by the Conspiracy

#### a)     Plaintiff and other Class Members Overpaid for Fire Trucks

126.     Defendants' inflated profit margins came at the expense of the municipalities and other government entities, like the Plaintiff, that indirectly purchased fire trucks.

127.     If the price of fire trucks had increased only at the rate of inflation between 2015 and 2025, pumper trucks would cost approximately $680,000 (rather than the current cost of $1 million), and ladder trucks would cost approximately $1.2 million (rather than $2 million).[140] In effect, U.S. Municipalities and other political subdivisions are paying approximately 47% (or $320,000) more for pumpers and 66% (or $800,000) more for ladder trucks in 2025 than would be expected based on inflationary costs alone.[141]

---

[135] *REV Group, Inc. Presentation – July 2021*, REV GROUP (July 2021), rev-group-presentation-july-2021.pdf
[136] Baker, Farrell & Kovaleski, *supra* note 59.
[137] OSHKOSH, INVESTOR DAY (June 5, 2025), at 83, 2025 Investor Day Presentation Slides
[138] *Id*. at 86.
[139] *Id*. at 87.
[140] Calculated assuming a pumper cost $500,000 and a ladder truck cost $900,000 in 2015.
[141] Alan M. Petrillo, *What's the Right Size Pump for Your Apparatus and How Does It Affect the Design?*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Sept. 27, 2023),

128.    There are approximately 5,000 new fire trucks sold in the United States every year, 75% of those trucks are pumpers.[142] That means that since 2016, Plaintiff and other Class members have paid a combined total of approximately $56.25 billion for new fire trucks, $19.8 billion more than expected based on increased inflation alone.[143]

129.    Even accounting for common issues in the fire truck market, such as supply chain and labor shortage challenges, these increases are far beyond what would be expected in a competitive market.

        **b)**      **Inflated Prices and Long backlogs delay Plaintiff and Class Members from Replacing Old Vehicles, Infringing on Public Safety**

130.    As fire trucks age, they become prone to more frequent and serious breakdowns. The NFPA recommends that a fire apparatus should be removed from the frontlines and transferred to the reserve fleet after 15 years and removed from service completely at the 20 or 25-year mark.[144]

131.    But, given Defendants manipulation of the market, it has become increasingly difficult for municipalities to replace aging vehicles in their fire departments' fleets in a timely manner. In many cases, fire departments must resort to operating trucks that have exceeded their service life because buying new trucks is prohibitively expensive and significantly delayed. The President of the International Association of Fire Fighters, Edward Kelly, stated that "from Atlanta, to Houston, to San Francisco, cities and towns are facing a crisis where demand for new fire trucks outstrips availability and funding."[145]

---

https://www.fireapparatusmagazine.com/fire-apparatus/pumpers/whats-the-right-size-pump-for-your-apparatus-and-how-does-it-affect-the-design

[142] *Id.*

[143] Cost based on inflation alone ($36.45 billion) calculated as ((3,750 pumper trucks per year * 9 years *$680,000) + (1,250 ladder trucks per year * 9 years * $1.2 million)).

[144] Tom Shand and Michael Wilbur, *The Apparatus Architect: Analyzing Spare and Reserve Apparatus*, FIREHOUSE.COM (Jan. 9, 2023), https://www.firehouse.com/apparatus/article/21288528/analyzing-spare-and-reserve-fire-apparatus.

[145] Jody Godoy, *As Fire truck Prices Hit $2 Million, US Firefighters Demand an Antitrust Probe*, REUTERS (May 13, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/fire-truck-prices-hit-2-million-us-firefighters-demand-an-antitrust-probe-2025-05-13

132. The prolonged use of aging and less reliable equipment puts the public at risk in communities across the country, particularly those facing natural disasters. As Edward Kelly accurately put it: "We are paying the price for all these corporate decisions. It serves the investor well, but it doesn't serve the public when you call 911 and the ladder truck is out of service."[146]

133. For example, the Los Angeles fires broke out in January 2025 and raged with no clear end for days. These fires killed 29 people and destroyed thousands of homes and properties. More than 100 of the Los Angeles Fire Department's ("LAFD") 183 fire trucks were out of service at the time the fires broke out.[147] Kristin Crowley, the LAFD fire chief, confirmed that the gaps in their fire truck fleet impeded the department's ability to respond to the fires.[148] Had additional firefighters and fire trucks been able to combat the blazes, they might have been able to prevent the devastation that followed, including $350 million in damage to L.A. public facilities and the loss of livelihoods.[149]

134. Other communities have faced similar difficulties. Jesse M. Flax, the fire chief in Camden, New Jersey, said that fire truck manufacturing delays and rising prices were "creating greater risk for the public and firefighters."[150] In 2024 crews reported to a house fire in Camden. Due to mechanical trouble with the fire truck crews were slowed in their response. A resident died in that blaze.[151] And in Castle Rock, Colorado, firefighters were forced to respond to incidents in Type 3 brush trucks, rather than in other preferred vehicles, due to a four-year delivery delay of a new apparatus.[152]

---

[146] *Id.*

[147] Letter to FTC and DOJ re Firetrucks, ECONOMICLIBERTIES.US (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf.

[148] Baker, Farrell & Kovaleski, *supra* note 59.

[149] Letter to FTC and DOJ re Firetrucks, ECONOMICLIBERTIES.US (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf.

[150] Baker, Farrell & Kovaleski, *supra* note 59.

[151] *Id.*

[152] Isabelle Crow, IAFF Spotlight Apparatus Crisis and Its Impact, FIRE & SAFETY J. (June 20, 2025) https://fireandsafetyjournalamericas.com/iaff-spotlight-apparatus-crisis-and-its-impact

> **c)** **Plaintiff and Class Members Have Also Suffered Harm Because They Have Had to Redirect Funds Toward Purchasing Fire Trucks That Would Have Otherwise Put Toward Other Essential Needs**

135.    In addition to problems adequately responding to disasters with diminished fleets, the rising cost of fire truck maintenance and replacement has squeezed fire departments' as well as entire municipalities' budgets, leaving them with fewer resources for other needs including recruiting and retaining firefighters.[153] For example, cities whose fire departments are facing budget challenges, including those in Spokane, Washington and Mills, Wyoming, have had to cancel essential training and even lay off firefighters.[154]

> **7.** **Defendants Concealed the Conspiracy and Plaintiff Did Not and Could Not Have Discovered Defendants' Anticompetitive Conduct**

136.    Plaintiff had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiff did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy until shortly before filing this Complaint. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix the price of fire trucks. Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff.

137.    Defendants concealed their conspiracy by communicating competitively sensitive information to one another through FAMA Statistical Reports that are unavailable to the public. They also attended members-only discussions during twice-annual FAMA meetings, allowing them to surreptitiously communicate and prevent the existence of written records. Because the public had no access to either the FAMA Reports or the FAMA members-only meetings, there was no reason for Plaintiff to suspect that Defendants were engaged in an unlawful anticompetitive scheme.

---

[153] Musharbash, *supra* note 40.

[154] Letter to FTC and DOJ re Firetrucks, ECONOMICLIBERTIES.US (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf.

38

138.    What's more, Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Prior to investigative articles by Basel Musharbash and journalists with the New York Times, Plaintiff reasonably considered it to be a competitive industry.[155] Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Manufacturer Defendants' fire truck prices before these recent events.

139.    By virtue of Defendants' fraudulent concealment of their wrongful conduct, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiff has as a result of the unlawful conspiracy alleged in this Complaint.

140.    Further, a continuing violation restarts the statute of limitations period each time Defendants commit an overt act. During the Class Period, Defendants continued to make sales of fire trucks whose prices were fixed as a result of Defendants' continually renewed and adjusted price-fixing and information exchange agreement. Defendants needed to continually renew and adjust their price fixing and information exchange agreement to account for ever-fluctuating economic and market conditions.

141.    Defendants' overt acts were new and independent acts that perpetuated their agreement and kept them current with market conditions. They were not merely reaffirmations of Defendants' previous acts. By constantly renewing and refining their agreement to reflect market conditions, Defendants inflicted new and accumulating injury on Plaintiff and Class members.

142.    As the concept of a continuing violation applies to a price-fixing conspiracy that brings about a series of unlawfully high-priced sales over a period of years, each sale to Plaintiff and Class members starts the statutory period running again regardless of Plaintiff's knowledge of the alleged illegality at much earlier times. This means that each illegally priced sale of fire trucks constituted a new cause of action for purposes of the statute of limitations.

## V.    ANTITRUST INJURY & DAMAGES

143.    Defendants' anticompetitive conduct has had the following effects, among others:

    a)    Price competition for fire trucks has been restrained or eliminated;

---

[155] Musharbash, *supra* note 40; Baker, Farrell & Kovaleski, *supra* note 59.

b) Prices for fire trucks sold by the Manufacturer Defendants and their divisions, subsidiaries, affiliates, or co-conspirators, in turn, have been raised, fixed, maintained, or stabilized at artificially high, non-competitive levels throughout the United States;

c) purchasers of fire trucks have been deprived of free and open competition; and;

d) purchasers of fire trucks have paid artificially inflated prices.

144. The ultimate purpose of Defendants' and their co-conspirators' conduct is to raise, fix, maintain, or stabilize the price of fire trucks and, as a direct and foreseeable result, Plaintiff and the Class have paid supra-competitive prices for fire trucks during the Class Period.

145. Because of the alleged violations of the antitrust laws, Plaintiff and Class members have sustained injury, having paid higher prices for fire trucks than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result, they have suffered damages.

146. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VI. CLASS ACTION ALLEGATIONS

147. Plaintiff brings this action on behalf of themselves and as a class action under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), seeking equitable and injunctive relief, and other relief pursuant to federal antitrust laws on behalf of the following Classes:

> **Nationwide Injunctive Class**: All entities, including all political subdivisions that indirectly purchased fire apparatus from Manufacturer Defendants and/or their co-conspirators in the United States from January 1, 2016 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period").

> **State Damages Class:** All entities, including all political subdivisions that indirectly purchased fire apparatus from Manufacturer Defendants and/or their co-conspirators in Indirect Purchaser States[156] during the Class Period.

---

[156] The "Indirect Purchaser States," for purposes of this complaint, are: Alabama, Alaska, Arkansas, Arizona, California, Colorado, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

40

148.     Excluded from the classes are States, Defendants, their parent companies, subsidiaries, and affiliates, any co-conspirators, Defendants' officers, directors, management, employees, subsidiaries, affiliates, or agents, all state and federal governmental agencies, and any judges or justices assigned to hear any aspect of this action.

149.     Plaintiff reserves the right to amend these Class definitions, including, and without limitation, the Class Period.

150.     The above-defined Class members are readily identifiable from information and records in the possession of Defendants.

151.     While Plaintiff does not know the exact number of Class members, Plaintiff believes that due to the nature of the trade and commerce involved, there are thousands of Class members geographically dispersed throughout the United States, such that joinder of all Class members would be impracticable.

152.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff purchased fire trucks directly from one or more of the Manufacturer Defendants and was damaged by the same common course of wrongful conduct.

153.     Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting only individual Class members. Such questions of law and fact common to the Class include, but are not limited to:

a)  Whether Defendants and their co-conspirators engaged in a contract, combination, or conspiracy to raise, fix, maintain, or stabilize prices of fire trucks sold in the United States in violation of federal antitrust laws;

b)  Whether Defendants agreed to unreasonably restrain trade in violation of federal antitrust laws;

c)  Whether Defendants and their co-conspirators participated in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements that they reached;

d)  The identity of the participants of the alleged conspiracy;

41

e) The scope and duration of the alleged conspiracy;

f) The acts performed by Defendants and their co-conspirators in furtherance of the alleged conspiracy;

g) The effect of Defendants' alleged conspiracy on the prices fire trucks were sold in the United States during the Class Period;

h) Whether the conduct of Defendants and their co-conspirators caused injury to the business or property of Plaintiff and other members of the Class;

i) Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief;

j) The appropriate class-wide measure of damages; and

k) Whether the statute of limitations was tolled or whether Defendants fraudulently concealed the existence of their anticompetitive conduct from Plaintiff and the Class.

154.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for fire trucks. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class.

155.    Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's interests are aligned with, and not antagonistic to, those of other members of the Class and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent itself and the Class.

156.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all members of the Class is impractical and Class members do not have interest in individually controlling the prosecution of separate actions. Prosecution as a class action will eliminate the possibility of duplicative litigation. The damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein

42

alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and the establishment of incompatible standards of conduct for Defendants and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.

157.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

### VII.    CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Violation of Section 1 of the Sherman Act**
**15 U.S.C. § 1**

158.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 157 as though fully set forth herein.

159.    From at least as early as January 1, 2016, and continuing through the present, Defendants and their co-conspirators entered into and engaged in an unlawful and continuing contract, combination, or conspiracy in unreasonable restraint of interstate trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

160.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to suppress, fix, stabilize, and maintain at artificially heightened levels the prices of fire trucks in the United States.

161.    Defendants and their co-conspirators carried out the conspiracy by agreeing to exchange competitively sensitive information such as prices, output, supplies, costs, and purchasing and sales strategies.

162.    Defendants and their co-conspirators engaged in the actions described above for the purpose and effect of carrying out their unlawful agreement to artificially raise, stabilize, and fix prices of fire trucks.

163.    Defendants' Conspiracy had the following effects, among others:

a)   Price competition in the sale of fire trucks has been restrained, suppressed, and/or eliminated in the United States;

b)   The production of fire trucks has been restrained at artificially low levels;

c)   Prices for fire trucks sold by the Manufacturer Defendants have been raised, fixed, maintained, or stabilized at artificially high, non-competitive levels throughout the United States; and

d)   Plaintiff and other Class members have been deprived of the benefits of free and open competition, including competitive pricing for fire trucks.

164.   Plaintiff and Class members have been injured and will continue to be injured by paying artificially inflated prices for Fire trucks purchased from the Manufacturer Defendants and their co-conspirators than they would have paid and will pay in the absence of the contract, combination, or conspiracy.

165.   The alleged contract, combination, or conspiracy is a per se violation of Section 1 of the Sherman Act.

166.   Plaintiff and members of the Class are entitled to damages, including treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, as well as injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, preventing and restraining further violations of the antitrust laws.

**SECOND CLAIM FOR RELIEF**
**Violation of Section 7 of the Clayton Act**
**15 U.S.C. § 18**
**(Against AIP, REV Group, Oshkosh, and Rosenbauer Defendants)**

167.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 157 as though fully set forth herein.

168.   Defendants unlawful conduct of successive acquisitions and coordination successfully consolidated the market and thus substantially lessened competition in the market for fire trucks in the United States.

169.   As a direct and foreseeable consequence of this anticompetitive consolidation, Plaintiff and members of the proposed Class have suffered injury to their business or property,

44

including paying supra-competitive prices and losing the benefits of free and open market competition.

170. Unless restrained by this Court, Defendants' violations are ongoing and likely to continue causing competitive harm.

171. Plaintiff and Class members are entitled to damages, including treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, as well as injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, preventing and restraining further violations of the antitrust laws.

## THIRD CLAIM FOR RELIEF
### Violation of the State Antitrust and Consumer Protection Laws

172. Plaintiffs re-alleges and incorporates by reference paragraphs 1 through 157 as though fully set forth herein.

173. During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the market for fire trucks in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

## Alabama Antitrust Law
### (On behalf of State Law Class Members that Purchased Fire Trucks in Alabama)

174. Defendants' agreement was an unlawful agreement to restrain trade in the State of Alabama in violation of Ala. Code § 6-5-60, *et seq*. Defendants' unlawful conduct had the following effects: (1) competition for Fire Trucks was restrained, suppressed, and eliminated within Alabama; (2) Fire Truck prices in the State of Alabama were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals in Alabama have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Alabama commerce and caused Class members in Alabama to pay supra-competitive prices for Fire Trucks. Accordingly, Plaintiff and the Class members in Alabama seek all forms of relief available under Ala. Cod § 6-5-60, *et seq*.

**Alaska Unfair Trade Practices and Consumer Protection Act**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in Alaska)**

175.    Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Alaska Unfair Trade Practices and Consumer Protection Act, Alaska Stat. § 45.50.471, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Alaska, by affecting, fixing, controlling, and/or maintaining, at artificial and non- competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in Alaska. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Truck prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Alaska; (2) Fire Truck prices in the State of Alaska were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Alaska commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq*., and, accordingly, Plaintiff and Class members in Alaska seek all relief available under that statute.

**Arkansas Deceptive Trade Practices Act**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in Arkansas)**

176. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Arkansas, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in Arkansas. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Truck prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Arkansas; (2) Fire Truck prices in the State of Arkansas were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code Ann. § 4-88-101, *et seq*., and, accordingly, Plaintiff and Class members in Arkansas seek all relief available under that statute.

47

**Arizona Antitrust Act**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in Arizona)**

177.    Defendants' agreement was an unlawful agreement to restrain trade in the State of Arizona in violation of Ariz. Rev. Stat. § 44-1401, *et seq*. Defendants' unlawful conduct had the following effects: (1) competition for Fire Trucks was restrained, suppressed, and eliminated throughout Arizona; (2) Fire Truck prices in the State of Arizona were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals in Arizona have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Arizona commerce and caused Class members in Arizona to pay supra-competitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Arizona seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, *et seq*.

**Arizona Consumer Fraud Act**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in Arizona)**

178.    Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1521, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Arizona, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in Arizona. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Truck prices were competitive. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Arizona; (2) Fire Truck prices in the State of Arizona were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Arizona commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That

48

loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1521, *et seq.*, and, accordingly, Plaintiff and Class members in Arizona seek all relief available under that statute.

### California Cartwright Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in California)

179. Defendants have entered into an unlawful agreement in restraint of trade in violation of Cal. Bus. & Prof. Code § 16700, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout California; (2) Fire Truck prices in the State of California were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected California commerce and caused Class members in California to pay supra-competitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in California seek all forms of relief available under Cal. Bus. & Prof. Code § 16700, *et seq.*

### California Unfair Competition Law
### (On Behalf of State Law Class Members that Purchased Fire Trucks in California)

180. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in California, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in California. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning

49

Defendants' unlawful activities and artificially inflated prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Truck prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of California; (2) Fire Truck prices in the State of California were raised, fixed, maintained, and stabilized at artificially high levels in violation of both the Sherman Act and California's Cartwright Act; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected California commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, and, accordingly, Plaintiff and Class members in California seek all relief available under that statute.

### Colorado State Antitrust Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Colorado)

181.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Colo. Rev. Stat. § 6-4-101, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout Colorado; (2) Fire Truck prices in the State of Colorado were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Colorado commerce and caused Class members in Colorado to pay supra-competitive prices for

50

Fire Trucks. Accordingly, Plaintiff and Class members in Colorado seek all forms of relief available under Colo. Rev. Stat. § 6-4- 101, *et seq.*

## Colorado Consumer Protection Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Colorado)

182.    Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Colorado, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in Colorado. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Truck prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Colorado; (2) Fire Truck prices in the State of Colorado were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Colorado commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6-1-101, *et*

*seq.*, and, accordingly, Plaintiff and Class members in Colorado seek all relief available under that statute.

## Connecticut Antitrust Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Connecticut)

183.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Conn. Gen. Stat. § 35-24, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout Connecticut, and (2) Fire Truck prices in the State of Connecticut were fixed, controlled, and maintained at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Connecticut commerce and caused Class members in Connecticut to pay supra-competitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Connecticut seek all forms of relief available under Conn. Gen. Stat. § 35-24, *et seq*.

## District of Columbia Antitrust Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in the District of Columbia)

184.    Defendants have entered into an unlawful agreement in restraint of trade in violation of D.C. Code § 28-4501, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Fire Truck prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; and (3) Plaintiff and members of the Class, including those who resided in the District of Columbia and Purchased Fire Trucks in the District of Columbia, paid supra-competitive, artificially inflated prices for Fire Trucks. During the Class Period, Defendants' unlawful conduct substantially affected the District of Columbia's commerce and caused Class members in the District of Columbia to pay supra-competitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in the District of Columbia seek all forms of relief available under D.C. Code § 28-4501, *et seq*.

52

## District of Columbia Consumer Protection Procedures Act
## (On Behalf of State Law Class Members that Purchased Fire Trucks in the District of Columbia)

185.     Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the District of Columbia Consumer Protection Procedures Act, D.C. Code, § 28-3901, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in the District of Columbia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in the District of Columbia. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Truck prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Fire Truck prices in the District of Columbia were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected the District of Columbia's commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code § 28-3901, *et seq*., and, accordingly, Plaintiff and Class members in the District of Columbia seek all relief available under that statute.

53

## Florida Deceptive and Unfair Trade Practices Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Florida)

186.     Defendants' unfair competition or unfair, and unconscionable acts or practices violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Florida, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in Florida. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Florida; (2) Fire Truck prices in the State of Florida were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Florida commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq*., and, accordingly, Plaintiff and Class members in Florida seek all relief available under that statute.

## Hawaii Antitrust Law
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Hawaii)

187.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Haw. Rev. Stat. Ann. § 480-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout Hawaii; (2) Fire Truck prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; and (3) Plaintiff and members of the Class, including those who resided in the Hawaii and Purchased Fire Trucks in Hawaii, paid supra-competitive, artificially inflated prices for Fire Trucks. During the Class Period, Defendants' unlawful conduct substantially affected Hawaii commerce and caused Class members in Hawaii to pay supra-

competitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Hawaii seek all forms of relief available under Haw. Rev. Stat. Ann. § 480-1, *et seq.*

## Illinois Antitrust Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Illinois)

188.    Defendants have entered into an unlawful agreement in restraint of trade in violation of 740 Ill. Comp. Stat. 10/1, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout Illinois; (2) Fire Truck prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; and (3) Plaintiff and members of the Class, including those who resided in the Illinois and Purchased Fire Trucks in Illinois, paid supra- competitive, artificially inflated prices for Fire Trucks. During the Class Period, Defendants' unlawful conduct substantially affected Illinois commerce and caused Class members in Illinois to pay supra-competitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Illinois seek all forms of relief available under 740 Ill. Comp. Stat. 10/1, *et seq.*

## Illinois Consumer Fraud & Deceptive Business Practices Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Illinois)

189.    Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Illinois, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in Illinois. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Truck prices were competitive and fair.

190.    Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Illinois; (2) Fire Truck prices in the State of Illinois were raised, fixed, maintained, and stabilized at artificially

high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Illinois commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. 505/1, *et seq*., and, accordingly, Plaintiff and Class members in Illinois seek all relief available under that statute.

**Iowa Competition Law**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in Iowa)**

191.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Iowa, and (2) Fire Truck prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Iowa. During the Class Period, Defendants' unlawful conduct substantially affected Iowa commerce and caused Class members in Iowa to pay supra-competitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Iowa seek all forms of relief available under Iowa Code § 553.1, *et seq*.

**Kansas Restraint of Trade Act**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in Kansas)**

192.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Kan. Stat. Ann. § 50-101, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated

56

throughout the State of Kansas; (2) Fire Truck prices in the State of Kansas were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Kansas commerce and caused Class members in Kansas to pay supra-competitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Kansas seek all forms of relief available under Kan. Stat. Ann. § 50-101, *et seq*.

### Maine Antitrust Law
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Maine)

193. Defendants have entered into an unlawful agreement in restraint of trade in violation of Me. Stat. Tit. 10, §1101, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Maine; and (2) Fire Truck prices in the State of Maine were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Maine commerce and caused Class members in Maine to pay supra-competitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Maine seek all forms of relief available under Me. Stat. Tit. 10, § 1101, *et seq*.

### Maryland Antitrust Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Maryland)

194. Defendants have entered into an unlawful agreement in restraint of trade in violation of Md. Code Ann., Com. Law § 11-201, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Maryland; and (2) Fire Truck prices in the State of Maryland were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Maryland commerce and caused Class members in Maryland to pay supra-competitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Maryland seek all forms of relief available under Md. Code Ann., Com. Law § 11-201, *et seq*.

**Maryland Consumer Protection Act**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in Maryland)**

195.     Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Maryland Consumer Protection Act, Md. Code Ann. Com. Law § 13-101, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Maryland, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in Maryland. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Truck prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Maryland; (2) Fire Truck prices in the State of Maryland were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Maryland commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Code Ann., Com. Law § 13- 101, *et seq*., and, accordingly, Plaintiff and Class members in Maryland seek all relief available under that statute.

58

## Massachusetts Consumer Protection Act
## (On Behalf of State Law Class Members that Purchased Fire Trucks in Massachusetts)

196. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ann. Ch. 93A § 1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Massachusetts, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in Massachusetts. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks.

197. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Trucks prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the Commonwealth of Massachusetts; (2) Fire Truck prices in the Commonwealth of Massachusetts were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Massachusetts commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation

59

of Mass. Gen. Laws Ann. Ch. 93A § 1, *et seq.*, and, accordingly, Plaintiff and Class members in Massachusetts seek all relief available under that statute.

## Michigan Antitrust Reform Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Michigan)

198.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws § 445.771, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Michigan; and (2) Fire Truck prices in the State of Michigan were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Michigan commerce and caused Class members in Michigan to pay supra-competitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Michigan seek all forms of relief available under Mich. Comp. Laws § 445.771, *et seq.*

## Michigan Consumer Protection Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Michigan)

199.    Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.903, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Michigan, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in Michigan. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Truck prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Michigan; (2) Fire Truck prices in the State of Michigan were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Michigan commerce and

60

consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Comp. Laws M§ 445.903 *et seq.*, and, accordingly, Plaintiff and Class members in Michigan seek all relief available under that statute.

**Minnesota Antitrust Law**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in Minnesota)**

200.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Minn. Stat. § 325D.49, *et seq.* Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Minnesota; and (2) Fire Truck prices in the State of Minnesota were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Minnesota commerce and caused Class members in Minnesota to pay supra-competitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Minnesota seek all forms of relief available under Minn. Stat. § 325D.49, *et seq*.

**Minnesota Uniform Deceptive Trade Practices Act**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in Minnesota)**

201.    Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43-48, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Minnesota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the

61

prices at which Fire Trucks were sold, distributed, or obtained in Minnesota. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Trucks prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Minnesota; (2) Fire Truck prices in the State of Minnesota were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Minnesota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43-48, *et seq*., and, accordingly, Plaintiff and Class members in Minnesota seek all relief available under that statute.

### Mississippi Antitrust Law
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Mississippi)

202.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Miss. Code Ann. § 75-21-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Mississippi; and (2) Fire Truck prices in the State of Mississippi were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period,

62

Defendants' unlawful conduct substantially affected Mississippi commerce and caused Class members in Mississippi to pay supra-competitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Mississippi seek all forms of relief available under Miss. Code Ann. § 75-21-1, *et seq*.

## Missouri Merchandising Practices Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Missouri)

203.     Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.020, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Missouri, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in Missouri. Plaintiff and Class members of purchased Fire Trucks for personal or household purposes. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Trucks prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Missouri; (2) Fire Truck prices in the State of Missouri were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Missouri commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' conduct, as described herein. Upon information and belief, Defendants also directed advertising and marketing efforts for Fire Trucks in the State of Missouri. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material

63

to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mo. Rev. Stat. § 407.020, *et seq.*, and, accordingly, Plaintiff and Class members in Missouri seek all relief available under that statute.

**Montana Unfair Trade Practices & Consumer Protection Act**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in Montana)**

204.     Defendants' unfair, unconscionable, or deceptive acts or practices violated the Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code, §§ 30-14-101, *et seq.*, and 30-14-201, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Montana, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in Montana. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Montana; (2) Fire Truck prices in the State of Montana were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-101, *et seq.*, and 30-14-201, *et seq.*, and, accordingly, Plaintiff and Class members in Montana seek all relief available under that statute.

**Nebraska Junkin Act**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in Nebraska)**

205.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Neb. Rev. Stat. § 59-801, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Nebraska; and (2) Fire Truck prices in the State of Nebraska were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants'

64

unlawful conduct substantially affected Nebraska commerce and caused Class members in Nebraska to pay supra-competitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Nebraska seek all forms of relief available under Neb. Rev. Stat. § 59-801, *et seq*.

## Nebraska Consumer Protection Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Nebraska)

206. Defendants' unfair competition or unfair, and unconscionable acts or practices violated the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nebraska, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in Nebraska. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Nebraska; (2) Fire Truck prices in the State of Nebraska were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Nebraska commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq*., and, accordingly, Plaintiff and Class members in Nebraska seek all relief available under that statute.

## Nebraska Antitrust Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Nevada)

207. Defendants have entered into an unlawful agreement in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A.210, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Nevada; and (2) Fire Truck prices in the State of Nevada were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected Nevada commerce and caused Class members in Nevada to pay

65

supra-competitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Nevada seek all forms of relief available under Nev. Rev. Stat. Ann. § 598A.210, *et seq.*

### Nevada Deceptive Trade Practices Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Nevada)

208. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nevada, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in Nevada. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Truck prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Nevada; (2) Fire Truck prices in the State of Nevada were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Nevada commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*, and, accordingly, Plaintiff and Class members in Nevada seek all relief available under that statute.

66

**New Hampshire Antitrust Law**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in New Hampshire)**

209.    Defendants have entered into an unlawful agreement in restraint of trade in violation of N.H. Rev. Stat. Ann. § 356:1, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of New Hampshire; and (2) Fire Truck prices in the State of New Hampshire were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' unlawful conduct substantially affected New Hampshire commerce and caused Class members in New Hampshire to pay supra-competitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in New Hampshire seek all forms of relief available under N.H. Rev. Stat. Ann. § 356:1, *et seq*.

**New Hampshire Consumer Protection Act**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in New Hampshire)**

210.    Defendants' unfair competition or unfair, and unconscionable acts or practices violated the New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in New Hampshire, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in New Hampshire. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of New Hampshire; (2) Fire Truck prices in the State of New Hampshire were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected New Hampshire commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. Defendants have engaged in unfair competition or unfair or deceptive

67

acts or practices in violation of N.H. Rev. Stat. Ann. § 358-A:1, *et seq*., and, accordingly, Plaintiff and Class members in New Hampshire seek all relief available under that statute.

**New Jersey Antitrust Act**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in New Jersey)**

211. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.J. Stat. Ann. § 56:9-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of New Jersey; (2) Fire Truck prices in the State of New Jersey were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected New Jersey commerce and caused Class members in New Jersey to pay supra-competitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in New Jersey seek all forms of relief available under N.J. Stat. Ann. § 56:9-1, *et seq*.

**New Mexico Antitrust Act**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in New Mexico)**

212. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.M. Stat. Ann. § 57-1-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of New Mexico; (2) Fire Truck prices in the State of New Mexico were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected New Mexico commerce and caused Class members in New Mexico to pay supra-competitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in New Mexico seek all forms of relief available under N.M. Stat. Ann. § 57-1-1, *et seq*.

68

## New Mexico Unfair Practices Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in New Mexico)

213.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the N.M. Stat. § 57-12-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Fire Trucks were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiff and Class members. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M. Stat. § 57-12-3, in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiff and Class members and the prices paid by them for Fire Trucks as set forth in N.M. Stat. § 57-12-2E. Plaintiff and Class members were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price, and Plaintiff and Class members had no power to negotiate a lower price. Moreover, Plaintiff and Class members lacked any meaningful choice in purchasing Fire Trucks because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiff and Class members could avoid the overcharges. Defendants' conduct with regard to sales of Fire Trucks, including their illegal conspiracy to secretly fix the price of Fire Trucks at supra-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiff and Class members. Defendants took grossly unfair advantage of Plaintiff and Class members. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Fire Trucks. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of New Mexico; (2) Fire Truck prices in the State of New Mexico were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived

69

of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff and Class members have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. STAT. § 57-12-1, *et seq*., and, accordingly, Plaintiffs and Class members in New Mexico seek all relief available under that statute.

### New York Donnelly Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in New York)

214. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.Y. Gen. Bus. Law § 340, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of New York; (2) Fire Truck prices in the State of New York were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected New York commerce and caused Class members in New York to pay supra-competitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in New York seek all forms of relief available under N.Y. Gen. Bus. Law § 340, *et seq*.

### North Carolina Antitrust Law
### (On Behalf of State Law Class Members that Purchased Fire Trucks in North Carolina)

215. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.C. Gen. Stat. § 75-1, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of North Carolina; (2) Fire Truck prices in the State of North Carolina were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected North Carolina commerce and caused Class members in North Carolina to pay supra-competitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in North Carolina seek all forms of relief available under N.C. Gen. Stat. § 75-1, *et seq*.

70

## North Dakota Uniform State Antitrust Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in North Dakota)

216. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.D. Cent. Code § 51-08.1-01 *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of North Dakota; (2) Fire Truck prices in the State of North Dakota were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected North Dakota commerce and caused Class members in North Dakota to pay supra-competitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in North Dakota seek all forms of relief available under N.D. Cent. Code § 51-08.1- 01, *et seq*.

## Oregon Antitrust Law
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Oregon)

217. Defendants have entered into an unlawful agreement in restraint of trade in violation of Or. Rev. Stat. § 646.725, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Oregon; (2) Fire Truck prices in the State of Oregon were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Oregon commerce and caused Class members in Oregon to pay supra-competitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Oregon seek all forms of relief available under Or. Rev. Stat. § 646.725, *et seq*.

## Oregon Unfair Trade Practices Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Oregon)

218. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Oregon Unfair Trade Practices Act, Or. Rev. Stat. § 646.605, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Oregon, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which

71

Fire Trucks were sold, distributed, or obtained in Oregon. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Truck prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Oregon; (2) Fire Truck prices in the State of Oregon were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Oregon commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq*., and, accordingly, Plaintiff and Class members in Oregon seek all relief available under that statute.

### Pennsylvania Unfair Trade Practices & Consumer Protection Law
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Pennsylvania)

219. Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("PUTPCPL"), 73 Pa. Stat. Ann. § 201-1, *et seq*. The PUTPCPL prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 Pa. Stat. Ann. § 201-3. Among other things, the PUTPCPL prohibits "[e]ngaging in any other

72

fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. Stat. Ann. § 201-2(4)(xxi). Plaintiff and Pennsylvania Class members purchased Fire Trucks primarily for personal or household use. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Pennsylvania, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in Pennsylvania. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Truck prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the Commonwealth of Pennsylvania; (2) Fire Truck prices in the Commonwealth of Pennsylvania were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Pennsylvania commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 P.S. § 201-1, *et seq*., and, accordingly, Plaintiff and Class members in Pennsylvania seek all relief available under that statute.

**Rhode Island Antitrust Act**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in Rhode Island)**

220.     Defendants have entered into an unlawful agreement in restraint of trade in violation of R.I. Gen. Laws § 6-36-7, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Rhode Island; (2) Fire Truck prices in the State of Rhode Island were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Rhode Island commerce and caused Class members in Rhode Island to pay supra-competitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Rhode Island seek all forms of relief available under R.I. Gen. Laws § 6-36-7, *et seq*.

**Rhode Island Unfair Trade Practice and Consumer Protection Act**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in Rhode Island)**

221.     Defendants' unfair competition or unfair, unconscionable, or deceptive acts or practices violated the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Truck prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Rhode Island; (2) Fire Truck prices in the State of Rhode Island were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected Rhode Island commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and Class

74

members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws § 6-13.1-1, *et seq.*, and, accordingly, Plaintiff and Class members in Rhode Island seek all relief available under that statute.

### South Carolina Unfair Trade Practices Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in South Carolina)

222.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of South Carolina; (2) Fire Truck prices in the State of South Carolina were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and South Carolina Class members have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10, *et seq*., and, accordingly, Plaintiff and Class members in South Carolina seek all relief available under that statute.

75

## South Dakota Antitrust Law
### (On Behalf of State Law Class Members that Purchased Fire Trucks in South Dakota)

223. Defendants have entered into an unlawful agreement in restraint of trade in violation of S.D. Codified Laws § 37-1-3.1, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of South Dakota; (2) Fire Truck prices in the State of South Dakota were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected South Dakota commerce and caused Class members in South Dakota to pay supra-competitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in South Dakota seek all forms of relief available under S.D. Codified Laws § 37-1-3.1, *et seq*.

## South Dakota Deceptive Trade Practices and Consumer Protection Statute
### (On Behalf of State Law Class Members that Purchased Fire Trucks in South Dakota)

224. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Fire Trucks were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiff and Class members concerning Defendants' unlawful activities and artificially inflated prices for Fire Trucks. Defendants misrepresented to all purchasers during the Class Period that Defendants' Fire Trucks prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of South Dakota; (2) Fire Truck prices in the State of South Dakota were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' illegal conduct substantially affected South Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiff and

76

Class members suffered an ascertainable loss of money or property because of Defendants' use of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Fire Trucks, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Fire Trucks at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information material to Plaintiff and Class members as they related to the cost of Fire Trucks they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq.*, and, accordingly, Plaintiff and Class members in South Dakota seek all relief available under that statute.

## Tennessee Fair Trade Practice Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Tennessee)

225. Defendants have entered into an unlawful agreement in restraint of trade in violation of Tenn. Code Ann. § 47-25-101, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for the sale of Fire Trucks was restrained, suppressed, and eliminated throughout the State of Tennessee; (2) prices for Fire Trucks, tangible goods, in the State of Tennessee were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Tennessee commerce and caused Class members in Tennessee to pay supra-competitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Tennessee seek all forms of relief available under Tenn. Code Ann. § 47-25-101, *et seq*.

## Utah Antitrust Act
### (On Behalf of State Law Class Members that Purchased Fire Trucks in Utah)

226. Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Ann. § 76-10-3101, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for the sale of Fire Trucks was restrained, suppressed, and eliminated

throughout the State of Utah; (2) prices for Fire Trucks in the State of Utah were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Utah commerce and caused Class members in Utah to pay supra-competitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Utah seek all forms of relief available under Utah Code Ann. § 76-10-3101, *et seq*.

**Vermont Antitrust Law**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in Vermont)**

227. Defendants have entered into an unlawful agreement in restraint of trade in violation of 9 Vt. Stat. Ann. § 2453, *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Vermont; (2) Fire Truck prices in the State of Vermont were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' unlawful conduct substantially affected Vermont commerce and caused Class members in Vermont to pay supra-competitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Vermont seek all forms of relief available under 9 Vt. Stat. Ann. § 2465, *et seq*.

**West Virginia Antitrust Act**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in West Virginia)**

228. Defendants have entered into an unlawful agreement in restraint of trade in violation of W. Va. Code § 47-18-1, *et seq*. Defendants' Conspiracy had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of West Virginia; (2) Fire Truck prices in the State of West Virginia were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of West Virginia and caused Class members in West Virginia to pay supra-competitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in West Virginia seek all forms of relief available under W. Va. Code § 47-18-1, *et seq*.

78

**Wisconsin Antitrust Act**
**(On Behalf of State Law Class Members that Purchased Fire Trucks in Wisconsin)**

229.     Defendants have entered into an unlawful contract and conspiracy in restraint of trade in violation of Wis. Stat. § 133.03 *et seq*. Defendants' unlawful conduct had the following effects: (1) price competition for Fire Trucks was restrained, suppressed, and eliminated throughout the State of Wisconsin; (2) Fire Truck prices in the State of Wisconsin were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Wisconsin and caused Class members in Wisconsin to pay supra-competitive prices for Fire Trucks. Accordingly, Plaintiff and Class members in Wisconsin seek all forms of relief available under Wis. Stat. § 133.03.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment in Violation of Common Law**

230.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 157 as though fully set forth herein.

231.     Plaintiff and other Class members purchased fire trucks during the Class Period directly from Defendants and their co-conspirators. These transactions were presumed to result from a normal competitive market and to reflect legitimate competitive behavior.

232.     However, rather than competing aggressively with each other, Defendants colluded to raise, fix, and stabilize the prices of fire trucks purchased by Plaintiff and other Class members.

233.     As a result of Defendants' conspiracy, Defendants reaped unjust profits and artificially widened margins at the expense of Plaintiff and the Class, causing Plaintiff to pay higher prices for fire trucks than they would have paid had Defendants acted lawfully and fairly.

234.     It is unjust and inequitable for Defendants to have enriched themselves in this manner at the expense of Plaintiff and the Class, and equity and good conscience require Defendants to make restitution.

235.     Plaintiff and Class members therefore seek to recover the monies they were unlawfully overcharged due to Defendants' conduct as alleged herein.

## VIII.  PRAYER FOR RELIEF

236.    Plaintiff, individually and on behalf of the Classes, respectfully requests judgment against Defendants, as follows:

a)      That the Court determine that this action may be maintained as a class action under Rule 23(a) & (b) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and its counsel of record as Class Counsel, and that the Court direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Classes, once certified;

b)      That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the federal and state laws set forth above;

c)      That the Court award Plaintiff and members of the Classes damages, treble damages, punitive damages, and/or restitution in an amount to be determined at trial;

d)      That the Court issue appropriate injunctive and other equitable relief against Defendants;

e)      That the Court award Plaintiff pre- and post-judgment interest;

f)      That the Court award Plaintiff their costs of suit, including reasonable attorneys' fees and expenses, including costs of consulting and testifying experts, as permitted by law; and

g)      That the Court award any and all such other relief as the Court may deem just and proper.

## IX.  JURY DEMAND

237.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all matters so triable.

Dated: December 22, 2025

Respectfully submitted,

*/s/ Alex Phillips*
Alex Phillips (SBN 1098356)
Brittany Resch
Sam Strauss
Raina Borrelli
**STRAUSS BORRELLI PLLC**
One Magnificent Mile
980 Michigan Avenue, Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
aphillips@straussborrelli.com
bresch@straussborrelli.com
sam@straussborrelli.com
raina@straussborrelli.com

*/s/ Adam J. Zapala*
Adam J. Zapala
Elizabeth T. Castillo
Christopher F. Jeu
Christian S. Ruano
Lauren A. Devens
**COTCHETT, PITRE**
**& McCARTHY LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
azapala@cpmlegal.com
ecastillo@cpmlegal.com
cjeu@cpmlegal.com
cruano@cpmlegal.com
ldevens@cpmlegal.com

*Counsel for Plaintiff and the*
*Proposed Class*